ANN BARTON, The, (WESTCOTT v.)

[See Westcott v. The Ann Barton, Case No. 17,431.]

---

ANN CAROLINE, The, (WELLS v.)

[See Wells v. The Ann Caroline, Case 17,389.]

---

## Case No. 409.

### The ANN C. PRATT.

[1 Curt. 340;[1] 16 Law Rep. 92.]

Circuit Court, D. Maine. April Term, 1853.[2]

SHIPPING—BOTTOMRY—FRAUD—VALIDITY OF BOND—IMPLIED LIEN—SUBSTITUTION OF PARTIES.

1. Under the 34th admiralty rule, the underwriter, who has acepted an abandonment, which divests the original claimant of all interest, may be admitted to intervene and become the dominus litis, in a suit in rem.

[Cited in The Monticello v. Mollison, 17 How. (58 U. S.) 156; The Manistee, Case No.

[1][Reported by Hon. B. R. Curtis, Circuit Judge.]
[2][Affirmed by supreme court in Carrington v. The Ann C. Pratt, 18 How. (59 U. S.) 63. Reversing decree of the district court in Carrington v. The Ann C. Pratt, Case No. 2,445.]

9,027; The Potomac v. Cannon, 105 U. S. 634; The Manitoba, 30 Fed. 133.]

2. A bottomry bond, given for a larger sum than was advanced, for the purpose of deceiving the underwriter on the vessel, is void.

[Cited in The Irma, Case No. 7,064.]

3. Such a bond cannot be allowed to stand as security for the sum actually advanced.

[Cited in The Irma, Case No. 7,064.]

4. Bottomry is a peculiar contract, differing essentially from a loan with security, and is inconsistent with the existence of the lien implied by the marine law to secure advances to a master in a foreign port to make necessary repairs.

[Cited in The Unicorn, Case No. 9,849; The Irma, Id. 7,064; The D. B. Steelman, 48 Fed. 582; The Wexford, 7 Fed. 680; Force v. Providence W. Ins. Co., 35 Fed. 769. Followed in Morrison v. The Unicorn, Case No. 9,849.]

5. When the express contract of bottomry is void for fraud, no recovery can be had upon the footing of an implied contract and lien.

[In admiralty. Libel on bottomry bond by Nehemiah Carrington against the brig Ann C. Pratt, Leonard B. Pratt, claimant. Decree for libellant for his implied lien, the bond being void for fraud. (Not reported.) Claimant appeals. Reversed, and libel dismissed, with costs. The libellant then appealed to the supreme court, where the circuit court decree was affirmed, sub nom. Carrington v. The Ann C. Pratt, 18 How. (59 U. S.) 63.]

This was an appeal from a decree of the district court in a cause of bottomry. The brig Ann C. Pratt sailed from Frankfort, in the state of Maine, Nov. 7, 1850, commanded and owned by Leonard B. Pratt, on a voyage to the Western islands, and thence to such other port or ports as the master should determine to visit. She arrived at Terceira on the 29th of November having encountered severe gales and been obliged to throw over a part of her deck-load. She sailed thence for St. Michael, and arrived in sight of that island on the 31st of December, but owing to gales of wind and thick squally weather, was unable to come to anchor until the 11th of January; and from that day she lay in an open roadstead until the 13th of January, when, the master being on shore with the ship's papers, she was struck by a heavy squall, parted her cables and all her other fasts, and was driven to sea with no anchor on board. Richard R. Airey, the mate, took the command, and determined to run for St. Thomas, whither the master had, before the disaster, concluded to go from St. Michael. The propriety of this determination was questioned by the claimant, and much of the evidence bears on this question. The brig arrived at St. Thomas on the 6th of February; a survey was called, and pretty extensive repairs were ordered by the surveyors. Money to make these repairs was advanced by the libellant, and a bottomry bond taken, signed by Airey. Other facts, necessary to the determination of the case, are stated in the opinion of the court.

Before CURTIS, Circuit Judge, and WARE, District Judge.

CURTIS, Circuit Justice. There is a preliminary question in this case, which must be first disposed of. On the return of the process, in the court below, Leonard B. Pratt appeared and claimed the brig as sole owner. In that capacity, he was admitted by the court, contested the action upon answer and proof, appealed from the decree, and entered his appeal in this court. After the appeal had been claimed, an abandonment, which he had previously made of the brig to the company that had underwritten a policy of insurance on her, was accepted by the underwriters, who applied to the court, by petition, on the fourth day of the term at which the appeal was entered, setting forth these facts, and praying for leave to intervene. The question is, whether, at this stage of the cause, this can be allowed. The thirty-fourth admiralty rule of the supreme court regulates the exercise of the right of intervention by third persons, in some cases, where that right exists, "according to the course of admiralty proceedings;" but it does not determine in what cases third persons are entitled thus to be heard. The forty-third rule does declare, as well as regulate, the exercise of the right of intervening, pro interesse suo; but it extends only to an interest in any proceeds in the registry, and has no application to a case where the third person seeks to come in as sole owner of the res and contest the suit.

In the absence of any direct authority, it would seem to be quite clear, that a court of admiralty, no more than a court of equity, would take notice of mere voluntary assignments of the subject in dispute, made pendente lite by the respondent. It cannot suffer its proceedings thus to be incumbered or affected. It is clear, also, that when there is a change of ownership, by operation of law, as in case of death, the same objection does not exist, and that it would be in conformity with its practice, to admit the representative to appear. By a rule of the supreme court, passed in 1821, such a case is specially provided for in that court. It does not extend to the circuit or district courts, but is of importance, as showing the propriety of admitting a representative in an appellate court. It must be observed, however, that it is only as a representative, as having become clothed with the rights of the original claimant by succession, that the third person is admitted. Now, the case before me does not belong to either of these classes of cases. It is not an assignment by operation of law, nor is it a mere voluntary assignment pendente lite. The policy was underwritten, the disaster occurred, and the right of abandonment existed, in point of law, before the suit was begun. The inchoate right of the assured to recover, as for a constructive total loss, could only be perfected by making an abandonment; and when duly made and accepted it relates back to the time of the disaster, and clothes the underwriter with all rights which at that time belonged to the owner. I do not consider an abandonment, made to perfect the previously existing rights of the insured, as resting on the same ground as a voluntary assignment; nor that the legal operation of such a transfer should be treated by the admiralty as similar to a sale pendente lite. I can perceive no particular inconvenience in allowing the underwriter, who has accepted an abandonment, to intervene and be admitted a party to the suit, as having succeeded to the rights of the original claimant, and that, thereupon, the appeal would be heard, as in other cases. But this is a case in which the underwriter claims to have succeeded to all the rights of the original claimant in the subject proceeded against, and that the latter is consequently completely divested of all interest, and should be, of all control over the suit, as in case of death or bankruptcy; and if admitted, he must dominus litis.

The thirty-fourth rule seems well enough adapted to such cases. Unless this construction be put upon it, I perceive no provision even for the death of a party, after an appeal to this court; and as this court does not possess power to remit an admiralty cause to the district court, and there is no rule expressly providing for a supplemental libel to be filed here, some rule to prevent the abatement of suits is needful; and I shall hold this thirty-fourth rule to be applicable to all such cases. The order which was entered at a former day, de bene esse, may, therefore, stand.

Having disposed of this preliminary question, I proceed to consider the merits of this case. There are some points in the case which are too clear to require me to pause upon them. That the mate succeeded to the command, in the emergency which occurred, there can be no doubt. The presumption is, that he was a person of competent skill and ability to discharge his duties; and if he was, and fairly exercised his judgment and discretion, all interested were bound by his acts. Upon these points, I perceive nothing in the evidence which would impeach his conduct. There is a difference of opinion among the experts; but it is far from satisfying my mind, that the respondents can avail themselves of the determination of the mate to carry the vessel to St. Thomas, as a defence to this bond. I deem it unnecessary to detail the evidence bearing on this part of the case. It is equally clear, that the mate, as temporary master, had the power, in a fit case of necessity, to take up a loan on bottomry; and that the lender, in such a case, is not held to see to anything more than an apparent necessity for the repairs. The authority of the mate, as temporary master, is essential to enable him to give such a bond. Like oth-

er agencies, he who seeks to acquire a right through a bond thus executed, must see to it that the person assuming to act as master, is rightfully master. But if he be master, it does not impose any new duty of diligence upon the lender, that he became such by reason of a casualty in the course of the voyage. When the owners appoint the mate, they are supposed to contemplate such casualties, and to agree that the mate shall exercise all the needful powers of master, in case they occur; and third persons may rightfully treat with him as master, when he has thus become such. The Kennersley Castle and The Rubicon, 3 Hagg. Adm. 8, 9; The Alexander, 1 Dod. 280.

The real difficulty of the case begins when we have advanced beyond these questions, and reached the bond itself. The amount actually lent by the libellants was $3877.25. The bottomry bond was given in the sum of $4591.42. Two sets of accounts and vouchers were made out, the one corresponding with the truth of the case, the other with the fictitious amount of the bottomry bond, and both sets were sent to the father of Captain Pratt, accompanied by letters of advice from the libellant and Airey, informing him that the bond was given for this larger sum, and the false account and vouchers sent, to enable the owner to make a claim therefor on the underwriters upon the vessel. A bill of exchange for the true sum was drawn by Airey, at the same time the bond was given. The frankness with which this scheme is explained to the father of Captain Pratt, by a mercantile house apparently of good standing, may induce the belief that such practices are not infrequent; but if so, they are not therefore the less reprehensible, nor is it the less necessary that they should be looked at in their true light, and visited with their just consequences, when they appear in a court of justice. This is a fraudulent bond, and the court will not lend its aid to enforce it. Even if the third person, on whom it was designed to impose, had sustained no confidential relation to either of the parties to this transaction, still the bond would be void. The jus tertii is entitled to protection from actual fraud; and the protection is given, by refusing relief to either party to the fraudulent arrangement, not on account of any merit of his opponent, but for the sake of public morals, and of the right of the party sought to be defrauded. This doctrine has been applied in numerous cases, even at the common law. Thus, a secret promise to pay to one creditor more than the composition paid to others for signing the deed, (Leicester v. Rose, 4 East, 372; Wells v. Girling, 1 Brod. & B. 447;) or to procure signatures to a petition for the discharge of an insolvent, (Payne v. Eden, 3 Caines, 213; Case v. Gerrish, 15 Pick. 49;) or to prevent fair competition at an auction sale; or a sale on execution, (Doolin v. Ward, 6 Johns. 194; Gardiner

v. Morse, 25 Me. 140;) or a promise to give more for goods than the price a friend, who had been prevailed on to buy them for the defendant, had paid, (Jackson v. Duchaire, 3 Term R. 551; Pidcock v. Bishop, 3 Barn. & C. 605,)—are all void at law, though both parties before the court participated, and the fraud was directed against a third person. But in this case, the underwriters had a relation to the vessel and to Airey at the time this bond was given. A disaster had occurred, calling for repairs. If their amount should prove to be sufficient to justify an abandonment, and it should be duly made, or made and accepted, it would relate back, by operation of law, to the time of the disaster; and from that time, Airey would be the agent of the underwriters. This has actually happened; and in the posture in which the case now stands before the court, Airey, when he gave this bond, acted for account of whom it might concern, and it has turned out to concern the underwriters. I have no hesitation in pronouncing the bond to be void for fraud. Nor can the bond be suffered to stand as security, even for the sum actually advanced. I adopt the language of Kent, J., in Sands v. Codwise, 4 Johns. 598, as expressing the true rule:—"I presume there is no instance to be met with of any reimbursement or indemnity afforded by a court of chancery to a particeps criminis in a case of positive fraud. In Smith v. Loader, Prec. Ch. 80, the party advancing money to an agent, under a combination with him to cheat the principal, lost his whole security from the principal for the money actually advanced to his agent. It is fit and proper this result should take place, as a contrary course might afford countenance to fraud, by giving it a partial effect." This is the settled rule in courts of chancery. Bates v. Graves, 2 Ves. Jr. 294; Attorney General v. Vigor, 8 Ves. 283; Boyd v. Dunlap, 1 Johns. Ch. 482. And it is as fit and applicable in a court of admiralty, which administers equity in maritime affairs.

One other question remains. Can the libellant be allowed to sustain the suit, upon the footing of a lien upon the vessel, under the general maritime law of Europe and America, for the sum actually advanced by him for repairs and supplies? The original libel is in a cause of bottomry, and propounds the bottomry bond, and seeks to recover upon it the whole principal sum, together with the marine interest, at the rate of ten per cent., stipulated for in the bond. The answer contested the validity of the bond, as being fraudulent. By an amendment, allowed to be filed at the hearing in the district court, an article was introduced, propounding a claim for the true amount advanced, together with the maritime interest; and upon this article, the court below declared that a lien existed in favor of the libellant, by operation of the general admiral-

ty law, and decreed accordingly. The claimant appealed. That such a lien would have attached upon this vessel, by operation of law, if no bottomry contract had been made, is clear. But two very grave questions arise, Whether the contract for a bottomry loan, followed by the execution of the bottomry bond, and the institution of a suit to enforce it, are consistent with the existence of that lien, by operation of law; and whether the bond, being pronounced to be fraudulent, the court will aid the lender to recover what, independent of the fraud, would justly have belonged to him?

In considering the first of these questions, I must take it to be true, that the lien created by the maritime law may be, and is, waived by the creditor, by any act or contract which is inconsistent with an intention to receive or retain that lien. The cases of The Nestor, [Case No. 10,126,] and The Chusan, [Id. 2,717,] were discussed and decided upon an admission of the correctness of this position, which is supported by Ramsey v. Allegre, 12 Wheat. [25 U. S.] 611, and The William Money, 2 Hagg. Adm. 136. The inquiry is, whether what was actually done in this case is consistent with an intention to obtain or hold the lien, which the law maritime creates in favor of the lender of money to the master, for making necessary repairs in a foreign port? The original libel states that the master, being in want of money, and having no other adequate means of procuring the same, borrowed of the libellant the sum of $4,591.42, upon the bottomry and hypothecation of the said brig, her tackle and apparel, and said sum was accordingly advanced and paid by the libellant, at the rate of ten per cent. premium for the maritime risk, and that in fulfilment of the agreement of bottomry, the master executed the bond. Airey testified that he made an agreement with the libellant, not in writing, to furnish funds to repair the brig, and to give him a bottomry bond on the vessel, to secure the payment of what he might advance. "He was not willing to furnish the funds, unless I would do as we talked." So that, in point of fact, the libellant was unwilling to deal upon any other footing than that of a contract of bottomry; and both parties, from the beginning, contracted solely with reference to such a bond. Now, this is a contract of a peculiar character, distinguishable, by very marked characteristics, from an ordinary loan. Pothier, Contrat a la Grosse, n. 6, says, "It differs from all other contracts; it forms a particular species by itself." Boulay-Paty, in his notes to Emerigon on Bottomry, (volume 2, p. 417, c. 1, § 2,) uses the following emphatic language: "It is neither a sale nor a partnership, nor a loan, properly speaking, nor insurance, nor a compound of different contracts, undique collatis membris,—but it is a contract having a specific name,—un contrat nomine,—and a character peculiar to it-

self." And Emerigon, in the text, (ch. 1, § 4,) has an elaborate dissertation on "the difference between the contract of bottomry, of loan, of partnership, and insurance;" and he points out five distinct particulars in which a contract of this kind differs from a loan, the most important of which are, the risk taken by the lender, and the premium paid for that risk. To a certain extent, the same view of this contract is taken in the case of The Atlas, 2 Hagg. Adm. 51. Indeed, so important is the difference between the contract of bottomry and a simple loan, that it has generally been deemed essential that it should be contracted for at the outset, and before the advances were made, (as it was in this case,) to support a bond when actually given. The Virgin, 8 Pet. [33 U. S.] 538; The Augusta, 1 Dod. 283; The Hebe, 2 W. Rob. Adm. 146; The Wave, 4 Eng. Law & Eq. 589. This being so, it seems to me impossible to maintain that the parties intended that a lien, by operation of law, should exist, for the security of a simple loan, to make repairs, in this case.

One method of determining whether both the implied lien and the express hypothecation, by way of bottomry, can be intended to exist together, is to consider that the first has for its object to secure the repayment of a loan of money, which is absolutely to be repaid, either upon demand, or at a stipulated time, and for which the master may pledge the security of the vessel, the owners, and himself; while a loan on bottomry does not oblige the owner personally, is to be repaid only on condition of surviving the perils, the risk of which the lender assumes; and constitutes, as the writers on maritime law have so emphatically declared, an obligation of a distinct and peculiar kind. It is true, that in both cases liens exist; but the one is implied by law, the other is created by the act of the master; the one is security for a debt of the owners and the master, the other is a right to receive a sum of money out of the thing at risk, in case it should survive the perils, the hazard of which is assumed by the lender; the one is merely a collateral security for a simple loan; the other is a transaction standing quite by itself, not capable of being analyzed into a loan and a mortgage to secure it, and a contract of insurance, and another of partnership, undique collatis membris, but simply a contract of bottomry, unlike all of them, and resembling nothing, and being consistent with nothing, but itself. There is one analogy derived from courts of chancery, which is entitled to some consideration. It is the case of a purchaser, who has taken a mortgage on the estate sold, to secure the purchase-money. It will be seen at once how far short of the case now before me this is; for there, both the equitable lien implied by law, and the security created by act of parties, operate to secure one and the same con-

tract to pay the purchase-money. Yet it has been, and still is, the subject of grave doubt, whether the implied lien can stand with a mortgage. Fish v. Howland, 1 Paige, 20; Little v. Brown, 2 Leigh, 353; Boos v. Ewing, 17 Ohio, 500; Manly v. Slason, 21 Vt. 275; Case of An Hostler, Metcalf's Yelv. 66, note. And it is settled, that any act of the parties, showing an intention not to rely on the implied lien, prevents its operation. Brown v. Gilman, 4 Wheat. [17 U. S.] 255. Having entered into a contract, in its nature and incidents wholly distinct from a simple loan, secured by a lien implied by law, the maxim, expressum facit cessare tacitum, applies. In my judgment, he who loans money on bottomry, makes a contract, which is to be followed out through all its remedies, as such; and when it proves to be voidable for fraud, and is avoided, he cannot treat it as a simple loan, secured by a maritime lien, and thus charge it on the property which he failed to obtain a right to, by the only contract which was made. In accordance with this, is the eighteenth rule of practice in the admiralty, prescribed by the supreme court. "In all suits on bottomry bonds, properly so called, the suit shall be in rem only, against the property hypothecated, or the proceeds of the property, in whosoever hands the same may be found, unless the master has, without authority, given the bottomry bond, or by his fraud or misconduct, has avoided the same, or has subtracted the property, &c., in which latter cases the suit may be in personam against the wrongdoer." I apprehend that this points to the only remedy which the lender has, when the bond is void for the fraud of the master, and the lender has not participated in that fraud. If he has participated, it is at least questionable, whether the court would exert itself actively, to give him a remedy for his actual advances, even if a maritime lien was implied by law. If the bond itself, which created an express lien, cannot be allowed to stand as security for the money advanced, can he, by changing merely the form of his remedy, recover on a lien implied by law?

I know of no precedent for this; and analogous cases may be found, which are inconsistent with it. Thus, if a policy of insurance be void for fraud of the insured, the law will not allow the premium to be recovered back, though, in the absence of fraud, it implies a promise to repay it. Schwartz v. United States Ins. Co., [Case No. 12,505;] Feise v. Parkinson, 4 Taunt. 640; Tyler v. Horne, and Chapman v. Frazer, Marsh. Ins. 661; Waters v. Allen, 5 Hill, 421. In point of principle, I am of opinion, that the fraud is an answer to the substance of the claim, for a restoration of the money advanced, and that it is not material through what forms of remedy the recovery is sought. But it is not necessary to go to this extent in this case. It is enough, that the bond, being fraudulent, cannot be enforced: and that, in point of fact. no such loan, as raises an implied lien, was made. The result is, that the libel must be dismissed, with costs.

[NOTE. On appeal, the supreme court, by Mr. Justice Nelson, affirmed the circuit court decree, declaring the bottomry bond void for fraud, and said: "It is insisted, however, that the security should be held valid for the amount actually advanced, conceding it to be void for the excess. It is true that a bottomry bond may be good in part and bad in part. and may be upheld even in cases when taken for a sum in the aggregate larger than that which properly constitutes a lien upon the vessel within this species of security. There are many cases to this effect. Abb. Shipp. 126, note; The Aurora, 1 Wheat. (14 U. S.) 107: M'Cutchen v. Marshall, 8 Pet. (33 U. S.) 228. These are cases, however, in which the items rejected were not properly chargeable on the ship, or were embraced within the bond from inadvertence or mistake, and entirely consistent with the good faith of the parties in the transaction. They stand upon widely different principles from those where the objectionable items are fictitious, and inserted in the bond with intent to defraud third persons. The entire security in such cases becomes tainted with the fraud, and a particeps criminis is not allowed to come into court to enforce it, even for the money advanced or expended; for to permit it would afford countenance to the fraud by giving partial effect to it. * * * It is insisted, however, assuming the bond to be void and inoperative, that the lender is then remitted to his implied lien, the same as if no bond had been given. How this might be in a case where the instrument was defective and void, for want of authority to execute it, or for any other cause consistent with the good faith of the parties, it is not now necessary to inquire, or express an opinion. But we think it clear that no such principle can be admitted in a case where the bond has been avoided on the ground that it was entered into in bad faith, and with intent to defraud. on the part of the lenders. Any other conclusion would be giving to a party the benefit of his own turpitude, which the law forbids. Carrington v. The Ann C. Pratt, 18 How. (59 U. S.) 63.]