## THE ASTORIAN.

### DI MEGLIO et al. v. GIACONI.
No. 6625.

Circuit Court of Appeals, Ninth Circuit.
March 14, 1932.

John J. Monahan, of San Pedro, Cal., for appellants.

Loucks & Phister, of San Pedro, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

Appellants instituted a libel in rem against the Astorian, an American fishing boat, for advances made to Y. Ito, charterer, and for the discharge of maritime liens against the vessel alleged to have been necessary for the proper operation of the fishing vessel Astorian. Three causes of libel are stated in three separate counts, the first count for $1,888.50 advanced by libellants and appellants, the second cause of action for $1,-890.37 advanced by John Vitalich and assigned to appellants; the third cause of action for $1,928.50 advanced by Vincent Petrasich and Pete Kuglis, also assigned to appellant. John Vitalich is doing business under the name of Chesapeake Fish Company, and Petrasich and Kuglis are doing business under the name of the Star Fisheries.

The issues were referred to a commissioner who made a report on the law and the facts favorable to the appellee. The appellant excepted to the report. Upon the hearing of appellants' exceptions to the commissioner's report brought on for hearing before the court by stipulation, the court filed a memorandum decision to the effect that he was of opinion that the advances were made upon the credit of Ito and not upon the credit of the Astorian, and that "his conclusions in this regard are justified by the evidence, and the exceptions should be disallowed and the Commissioner's report confirmed." This memorandum was dated January 16, 1931, and was followed by a final decree that libelants take nothing by their action, dated, entered, and recorded January 21, 1931. On March 10, 1931 appellants filed a petition in the District Court entitled "Petition for libel of review," the prayer of which is as follows: "Wherefore, your petitioner prays that as he will be prevented from taking an appeal in the absence of separate findings of fact and conclusions of law, as required by Supreme Court Admiralty Rule 46½ [28 US CA § 723] and the decision of the Supreme Court in Panama Mail S. S. Co. v. Vargas, 281 U. S. 670, 74 L. Ed. 1105, 50 S. Ct. 448, that this Honorable Court vacate and set aside the final decree herein, and that the court find the facts specially and state separately its conclusions of law thereon."

The petition was heard on March 23, 1931, and thereupon ordered submitted. On June 17, 1931, the court filed a memorandum decision to the effect "that the findings of the special master, the same having been confirmed by this court, are sufficient compliance with Rule 46½. The petition for review of libel is therefore denied." Notice of appeal from the decree was served and filed June 26, 1931, and the bond on appeal was approved on that date.

The appellee moves to dismiss the appeal upon the ground that it was taken more than three months after the entry of the decree. 28 USCA § 230; The Ruth (C. C. A.) 20 F.(2d) 314; The Albatross (C. C. A.) 19 F.(2d) 141.

■ The real question involved in the motion to dismiss is whether or not the petition entitled "Petition for libel of review" tolled the statutory limitation for appeal. As said by the Supreme Court in Aspen Mining & Smelting Co. v. Billings, 150 U. S. 31, 36, 14 S. Ct. 4, 6, 37 L. Ed. 986, speaking

through Chief Justice Fuller: "The rule is that if a motion or a petition for rehearing is made or presented in season and entertained by the court, the time limited for a writ of error or appeal does not begin to run until the motion or petition is disposed of. Until then the judgment or decree does not take final effect for the purposes of the writ of error or appeal. Brockett v. Brockett, 2 How. 238, 240 [11 L. Ed. 251]; Texas & Pac. Ry. v. Murphy, 111 U. S. 488, 4 S. Ct. 497 [28 L. Ed. 492]; Memphis v. Brown, 94 U. S. 715 [24 L. Ed. 244]."

It is true that a new trial in admiralty is rarely, if ever, applied for or granted (1 C. J. 1338, § 274, and notes), for the reason that upon appeal the case is tried de novo (Burdett v. Williams (D. C.) 29 F. 542; The Vaderland (D. C.) 19 F. 527), although a court of admiralty has the power upon a seasonable application during the term to reopen for rehearing a decree entered under a misapprehension of facts or on improper evidence (1 C. J. 1342, § 286, and cases cited under note 94). The petition filed by the appellant was ineffective as a petition for libel of review, for the reason that it was filed within the term, and the remedy by a petitioner for libel of review is, in effect, a new proceeding instituted to attack what would otherwise be final decree by reason of the expiration of the term and of the right of appeal. Jackson v. Munks (C. C.) 58 F. 596, affirmed (C. C. A.) 66 F. 571; The Columbia (D. C.) 100 F. 890; Hall v. Chisholm et al. (C. C. A.) 117 F. 807; Benedict on Admiralty (5th Ed.) vol. 1, § 275. See quotation from the decision by Mr. Justice Story in The New England, 3 Summ. 495, Fed. Cas. No. 10151, quoted by Judge Gilbert in Jackson v. Munks (C. C.) 58 F. 596. Without further discussion of the propriety or sufficiency of petition for libel of review, it is clear that petition filed herein fails to state facts essential for the maintenance of such petition as set forth in the above decisions. It does not follow, however, that the petition should be entirely ignored. In Dunlap's Admiralty Practice, published in 1836, the author states, at page 324: "It is not settled in the admiralty practice whether a cause, which has once been closed, can be reopened by libel of review, as in chancery by a bill of review. There seems to be as strong reasons for the possession of this power, in order to do justice, by a court of admiralty, as by a court of chancery. In the High Court of Admiralty in England, an opinion has been expressed, that the Court, in its range of large discretion, and by the very extended equity which it is in the habit of exercising, might, in a case of direct fraud, or something equivalent to it, suffer a cause which had been once closed to be re-opened; but there must be strong reasons, and mere negligence or oversight would not be a sufficient ground for this extraordinary interposition."

Judge Gilbert, in Jackson v. Munks (C. C.) 58 F. 596, states there are but few precedents to be found in the decisions of admiralty court upon the subject of the jurisdiction of this court to entertain a libel of review in admiralty.

In the case at bar the so-called petition for libel of review prayed that the decree be vacated because of an alleged failure to find the facts and state the conclusions of law and because of surprise on the part of the petitioner, in that he was not served with a copy of the proposed decree in accordance with rule 44 of the trial court. We think that the petition may be treated as a petition for reopening of the case and a rehearing within the meaning of the rule as stated by this court, speaking through Judge Dietrich in Thos. Day Co. v. Doble Laboratories, 41 F.(2d) 51, 52, wherein it was said: "To have the effect of tolling the statutory limitation for appeals it is, of course, not essential that the petition for rehearing be well taken, and it would seem to follow that if it is defective in form or substance and is denied for that reason it would still have such effect. True, if it is a mere sham it may be wholly ignored; but if, acting in good faith, a party files a petition which is ultimately held deficient because it does not meet some requirement of the rules in respect of either form or substance, it operates to postpone the finality of the decree until it is disposed of."

We conclude, therefore, that the decree was not final in the sense required by the statute to start the running of the time for appeal until the order of the trial court denying the petition for libel of review on June 17, 1931. The petition to dismiss the appeal must be denied.

We turn to a consideration of the appeal on the merits. The facts are as follows:

An undated written agreement between Union Fish Company, the Chesapeake Fish Company, and Star Fisheries, entered into "about the end September or the first of October," between libelants and their assignors, recited that the parties were desirous of procuring Mexican lobsters during the season 1929–1930, and for that purpose agreed "to

send the following boats out for lobsters, to wit, M. K. No. 2, Sousa, T. Bagalini, Fuco, Ido (Astorian), Trucks," and agreed that the lobsters from each vessel were to be divided in accordance with the ratio fixed in the agreement, which, as to the Astorian, provided 30 per cent. to the Union Fish Company, that is, libelants, 30 per cent. to the Star Fisheries, and 40 per cent. to Chesapeake Fish Company (John Vitalich); that all the parties should contribute their proportionate share of any expenses or advancement paid by each other "in direct connection with the sending out of any of the above listed boats for lobsters, and in accordance with the percentage of lobsters they are to receive from each respective boat. Such contributions are to be paid back immediately to each of the parties whenever any monies are collected or held out from the boats to cover advances, and shall be paid back in the same proportion as when contributed"; that, if other boats were sent out by any of the parties, each party was to have a right to accept his proportionate share of the lobsters. A charter party dated October 1, 1929, between Joseph V. Giaconi, claimant, and Y. Ito was also put in evidence, and the testimony shows that John N. Vitalich was present and took an active part in the negotiations for the same. This charter party provided for a lease of the vessel Astorian by claimant, Joseph V. Giaconi, to Y. Ito for an annual rental of $6,400, payable in the installments specified in the agreement, and contained two clauses, which are relied upon by the appellee as relieving the respondent boat from liens for supplies furnished the charterer, as follows: "The lessee [Y. Ito] further engages that the said boat, during the term of said lease, shall be kept tight, staunch, well fitted, tackled and provided with every requisite, and manned by a crew necessary for the proper handling of said boat. * * * That he will not sell, mortgage or otherwise dispose of said boat to any person or suffer it to be attached or taken upon execution. * * *"

On October 7, 1929, John N. Vitalich, one of the libelants' assignors, entered into a written agreement with Y. Ito, wherein Vitalich agreed to lend Ito $1,500 to be advanced from time to time "for the purchase of grocery supplies, skiffs, ropes, tackle, and lobster traps and crates, to be used by Ito in connection with fishing for and transportation of fish and lobsters." In consideration of this advance, Ito gave Vitalich an option to purchase all fish and lobsters brought to the port of San Diego or any other California port, for five years.

In pursuance of the above contracts, the commissioner to whom the matter had been referred, and the trial court, found that Ito established fishing camps along the coast of Lower California; that fishermen were placed in charge of camps and supplies furnished them, consisting of food and other necessities, lumber, and boats needed in their work; that each camp was charged with supplies furnished, and credited with lobsters turned over to Ito; that the moneys and supplies furnished for the enterprise were furnished to Ito; that for the purpose of carrying on the lobster fishing enterprise John N. Vitalich, Union Fish Company, libelant herein, and the Star Fisheries "furnished supplies and monies to Ito for the furtherance of the enterprise; that the supplies and monies furnished were for the payment of money due the owner of the vessel, the claimant herein, for supplies, and wages for the respondent vessel, and for supplies necessary in carrying on the work in the camps established by Ito; that these lobster fishing camps were maintained during the season 1929–1930 and lobsters were collected by the boat 'Astorian' and delivered to libellant and to libellants' assignors."

As a conclusion of law from the practically undisputed facts, the commissioner found that the moneys advanced were advanced upon the credit of Ito and not upon the credit of the respondent vessel. The commissioner declined to pass upon the authority of the charterer to contract obligations for supplies which would be a lien upon the vessel.

The appellants state the issues on appeal as three in number:

"Issue I. Do the payments thus made for and the merchandise thus delivered to the respondent boat 'Astorian,' give rise to a maritime lien, i. e., Are they Necessaries?

"Issue II. Did Y. Ito have authority in law to bind the vessel for said payments and merchandise?

"Issue III. Has claimant and appellee proved affirmatively that credit was given to Y. Ito to the exclusion of a credit to the vessel?"

The trial court decided the matter upon the third point. The argument is based upon the Act of Congress of June 23, 1910 (36 Stat. 604), as amended by the Jones Shipping Act of June 5, 1920, § 30, subsec. P. (46 USCA § 971), and subsec. Q (46 USCA §

972). Subsection P provides: "Any person furnishing * * * supplies * * * or other necessaries, to any vessel * * * upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

Subsection Q provides that among the persons presumed to have authority to procure such supplies and necessaries for the vessel is "any person to whom the management of the vessel at the port of supply is entrusted."

The charterer is such a person. The Golden Gate (Knutsen v. Associated Oil Co.) 52 F.(2d) 397 (C. C. A.). The appellants state the rule they seek to have applied in the case at bar as follows: "Now, the law is well settled that upon proof of delivery of the supplies to the vessel, libellants need not allege or prove that credit was given to the vessel, but enter court with a prima facie case, and the burden is on claimant to allege and prove affirmatively that credit was given to the owner to the exclusion of a credit to the vessel."

This view is supported by decisions in the cases of The Yankee, 233 F. 919, by the Circuit Court of Appeals of the Third Circuit; The Oceana, 244 F. 80, and The Bronx, 246 F. 809, 810, both by the Circuit Court of Appeals of the Second Circuit. In view of the above. the charterer having authority to create a lien upon the vessel for necessary supplies furnished to it, one of the principal questions involved in this appeal is whether or not the supplies were necessaries for the vessel. 46 USCA § 973.

It is conceded by the appellees that, if this vessel had conducted its fishing operations from on board the ship, and had sent small boats out to set traps and to bring in lobsters, the supplies furnished might. perhaps properly come under the description of necessaries furnished the vessel, but it is contended that, as to the supplies that were delivered to the various camps established on shore, the vessel was a mere cargo carrier, and that no lien attached therefor. In order to properly consider this matter, the facts with reference to the operations must be stated in more detail.

Y. Ito, the charterer, established fourteen lobster camps upon the coast of Mexico under permit obtained by the libelants from the Mexican government. The fishermen who were to conduct operations from these camps and the supplies necessary for their use ashore were transported by the Astorian from San Diego and Encinada to their respective camp sites. The Astorian thereafter visited these respective camps, and Ito purchased the lobsters caught by the fishermen, brought them to San Diego, and delivered them to libelants and their assignors in pursuance of the contract, as hereinabove stated. While in San Diego he secured more supplies and money with which to purchase additional lobsters. The advancements made to Ito were made under and in pursuance of the contract of October 7, 1929, for the purchase of supplies for the expedition, and included, among other things, installments due for the hire of the boat paid to claimant. The contention of the appellants that the supplies furnished for the fishing camps ashore were necessaries furnished to the ship within the meaning of 46 USCA § 972, cannot be maintained. While we need not determine the exact relationship between Ito, the charterer, and libelants and their assignors, in order to pass upon the question involved in this case, it is obvious that their engagement was in the nature of a joint adventure. The chartering of a ship was incident to the main purpose of the contract between Ito and libelants and their assignors. It is thus clear that the money and supplies furnished in connection with and for the purpose of the maintenance and operation of the camps ashore were not necessaries furnished for the ship. Some of the supplies and money, however, were undoubtedly furnished and used for the operation of the ship itself. The trial court did not separate these two classes of items in its findings, but determined that all the supplies were furnished upon the credit of Ito. This finding, in so far as it involves supplies for the operation of the camps on shore, is fully sustained by the evidence, and is necessarily involved in the conclusion that the supplies were not necessaries for the operation of the ship, whereas it appears here, libelants not only knew all about the charter party, but entered into engagements inconsistent with the claim that the supplies furnished were necessaries for the vessel. With reference to the supplies furnished the vessel which were necessary for its operation and maintenance, however, a different situation arises. In the first place, there is a presumption of law that the supplies so furnished to the charterer were furnished upon the credit of the vessel The Golden Gate, The Yankee, The Oceana, The Bronx, supra, 46 USCA § 972. The rule is thus strongly stated in the last-named case (The

90

Bronx): "* * * The lien is presumed on proof of due delivery on request of lawful supplies, until such presumption is destroyed by affirmative proof of agreement that the promising party was to be exclusively liable for payment."

The appellee's contention in this regard is that the charter party, by reason of the provisions hereinabove quoted, expressly deprives the charterer of the right to create a maritime lien upon the vessel, and that the libelants and their assignors, having full knowledge of the terms of the charter, were bound thereby, and therefore precluded from enforcing a lien thereon. That a charter party may have such an effect cannot be doubted. The Golden Gate, supra. We think, however, it is established by our decision in The Golden Gate, supra, and the authorities therein cited, that, in the absence of an express provision prohibiting the incurring of liens, the charterer could create such a lien. In re The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, The Portland (C. C. A.) 273 F. 401, 404. With reference to necessary supplies furnished to the vessel, the real question is whether or not the right to a maritime lien has been waived. 46 USCA § 974. In case of Marshall & Co. v. S. S. "President Arthur," 279 U. S. 564, 49 S. Ct. 420, 73 L. Ed. 846, the Supreme Court considered the effect of the changes in the maritime law due to the enactment of 46 USCA §§ 971, 972, 973, 974, in their original form in the maritime lien law of 1910 (36 Stat. 604, ch. 373), re-enacted in the Ship Mortgage Act of 1920 (section 30, Merchant Marine Act 1920, 41 Stat. 988, 1005, c. 250). On the authority of that decision and the cases therein cited with approval (Murray v. Lazarus, 1 Paine, 572, 17 Fed. Cas. 1049, No. 9962; Phelps v. The Camilla, Taney, 400, 19 Fed. Cas. 441, 445, No. 11073; Leland v. Medora, 2 Woodb. & M. 92, 15 Fed. Cas. 298, 299, No. 8237; The Ann C. Pratt, 1 Curt. 340, 1 Fed. Cas. 947, 950, No. 409; Taylor v. The Commonwealth, 23 Fed. Cas. 756, 757, No. 13787), we agree with the commissioner and the trial court that the express written agreement between John N. Vitalich and the charterer, Y. Ito, entered into on behalf of all the libelants and their assignors, by which, in consideration of the money advanced to Ito, he agreed to give Vitalich an option to purchase all fish and lobsters brought by him to the port of San Diego, or any other port in the state of California during the next five years at prevailing market prices, was in legal effect a waiv-

er of the right to a maritime lien upon the vessel chartered by Ito from the claimant in order to carry out the terms of the aforesaid agreement dated October 7, 1929. The fact that the charter party was signed a few days before the agreement of October 7, 1929, is without significance, for the reason that the whole arrangement, including the charter party itself, was made to carry out the agreement between the libelant and his assignors, as evidenced by the written agreement between them hereinabove set forth; the negotiations for these contracts being practically simultaneous.

Decree affirmed.