THE PIRATE.

THE KENILWORTH.

BAKER WHITELY COAL CO. v. THE PIRATE.

SAME v. THE KENILWORTH.

(*District Court, D. Maryland.* July 2, 1887.)

1. MARITIME LIENS—REPAIRS—HOME PORT.
   *Held,* that there was no lien in favor of material-men for repairs and supplies furnished in the port of Baltimore to two British steamers upon the orders of charterers, who were owners *pro hac vice,* and who were well-known residents of Baltimore.

2. SAME—PILOT'S SERVICES.
   *Held,* that there was a lien in favor of the pilots rendering services to the steamers on their inward and outward voyages.

(*Syllabus by the Court.*)

In Admiralty.
*E. C. Williams* and *Wm. Pinkney Whyte,* for libelant.
*John H. Thomas,* for respondents.
*Sebastian Brown* and *B. W. Mister,* for petitioners.

MORRIS, J. These are claims of various kinds asserted *in rem* by libels and petitions against the British steamers Pirate and Kenilworth of Glasgow, Scotland, for coal, repairs to machinery and boilers, sails, and provisions furnished to the steamers in the port of Baltimore, and for pilotage services rendered during a period when they were chartered by the owners, residents of Glasgow, to Hart & Co., residents of Baltimore, who were merchants engaged in the importation of foreign fruits into that port. The steamers were chartered in Glasgow to Hart & Co. on

the eighteenth September, 1885, for two years, to be employed by them in such lawful trade as they might direct, between the United States and the West Indies or South America, and were brought to Baltimore by them, and put into their regular line of vessels plying out of the port of Baltimore in the foreign fruit business; each one making a voyage to some West India port and back every two or three weeks. They remained continuously in that service from about October, 1885, until Hart and Co. failed in business, about the first of May, 1887. The charter-parties required that Hart & Co. should pay for the hire of the steamers a stipulated sum per month, to be remitted to the owners in sterling drafts, in two payments in advance each month; and stipulated that the charterers, in addition to the hire, should provide the masters and crews, and pay their wages, and provide and pay for all the provisions, coal, port charges, pilotages, and all other charges whatsoever, (except insurance,) and pay all repairs to engine and hull, and maintain the hull and machinery in a thoroughly efficient state, and redeliver the engine, boiler, and hull upon expiration of the charter in the same condition as received, fair wear and tear excepted. It was provided, however, that the charterers were not to pay for repairs to the engines or hull costing over £120 on any separate repair of damage, and it appears that repairs over that sum for any one damage were covered by policies of insurance in owner's favor. The questions raised by the pleadings, and considered in argument, are as to whether the several bills for supplies, repairs, and services now sued for were contracted under circumstances which give these creditors a privilege against the steamers, or whether their remedy is solely against the charterers.

In the first place it is obvious from the charter-parties, and from the acts done in pursuance of them, that the owners delivered these steamers fully into the possession and control of the charterers. The charterers took them from Glasgow, and brought them to Baltimore. There they put out the former masters, and put in command others of their own choosing, and used the vessels thereafter on their own account upon such voyages within the ports named in the charter-parties as they desired, without the control in any way of the owners. It is beyond doubt that the charterers were owners *pro hac vice*. *Thorp* v. *Hammond*, 12 Wall. 416. The owners had parted with their possession of the vessels, and with all control over every one on board. It was a demise of the vessels for a stipulated hire, not dependent in any way upon the transportation of goods or the earning of freight. It is urged that because it was stipulated that the owners should have a lien upon all cargoes and subfreights for the charter money,—a lien which they would not have if they parted with the possession of the vessel,—that therefore the court must find as a fact that they did not part with possession, and the charterers were not owners *pro hac vice*. But this is impossible. The owners contracted to surrender possession, and did in fact surrender possession and control, and no stipulation for a lien usually dependent upon their retaining possession could alter that fact. It is also suggested that the stipulation that the owners should have the privilege of selecting the

chief engineers of the steamers—they, however, to be paid by the charterers—was sufficient to retain possession; but the contrary of this has been often decided. 1 Pars. Shipp. & Adm. 279, 280.

The case presented is one of vessels demised for two years to charterers, and delivered into their possession, and of supplies and repairs furnished in the port where the charterers resided, and where they were well-known merchants, in good credit; the charterers, by the terms of the charter-parties, having bound themselves to pay for the supplies and repairs. It is to be considered, then, by whom, and under what circumstances, the supplies and repairs were ordered, and what knowledge the material-men had of the actual terms of the charters.

It is proved that it was a matter of general notoriety in the port of Baltimore that Hart & Co. had chartered these British steamers for the fruit trade upon time charters. Hart's initials were put upon their funnels, and they carried his flags, and were constantly noted in the newspapers as arriving and departing, with comments upon their cargoes of fruit. This went on for over a year, and everything indicated that they could not be vessels employed by Hart & Co. upon ordinary cargo-carrying charters. It must have been quite generally known among the people who supply ships that the masters had been changed by Hart & Co., and that they had put in command of one of these steamers an American master, and in command of the other a master long resident here. Then, as to the character of the repairs and supplies, (except the sails,) they were not required by a vessel which has met with disaster, to enable her to complete an interrupted voyage, but were those which a steamer making short regular trips in and out of a port would require for its ordinary maintenance, and were mostly supplied by these creditors at regular intervals; the repair bills of Reeder & Son to the Pirate running from March, 1886, to March, 1887. With regard to the ordering of these materials and supplies, it appears that although in some cases the quantity and character was indicated by some officer of the steamers, as is quite unavoidable, they were not ordered by the master. The persons who were to furnish the supplies were selected by the charterers, and the terms of the purchase agreed to by them, and the bills invariably sent to them. No one ever thought of presenting a bill to any officer of the ship, or to any foreign owner. For the amount of the claims of Charles Reeder & Sons they had taken a promissory note made by Hart & Co., in which was included a sum due for work on an ice-machine on shore. The facts proven show, in almost every case, a continuous dealing with known charterers, in the port of their residence, for the ordinary requirements of vessels.

The cases of *The City of New York*, 3 Blatchf. 187; *The India*, 14 Fed. Rep. 476, 16 Fed. Rep. 262; *The Sydney L. Wright*, 5 Hughes, 474,—which are relied upon by counsel for the creditors, and in which claims of material-men were held to be entitled to a privilege against the ship, —were all cases in which the supplies were furnished to chartered vessels in ports in which the charterers were non-residents. In those cases the vessels were in all respects foreign; foreign in respect to the general own-

ers, and foreign in respect to the charterers who were the owners *pro hac vice*. But in the cases of *The Golden Gate*, 1 Newb. Adm. 308; *The Secret*, 3 Fed. Rep. 665, 15 Fed. Rep. 480; *The Norman*, 6 Fed. Rep. 406, 28 Fed. Rep. 383; and *Stephenson* v. *The Francis*, 21 Fed. Rep. 715,—all these were cases in which the supplies were ordered by the charterers in the port of their own residence, and, although the vessels were foreign in respect to their general owners, it was held that no maritime privilege arose; there being no implication that the ship's necessities could only be relieved by pledging her, when the charterer who was bound to supply these necessities was present in the place of his residence, and himself contracted for the supplies. *The Cumberland*, 30 Fed. Rep. 449, decides nothing to the contrary of this. It was there held that for supplies furnished in a foreign port upon the order of the master, he being also owner *pro hac vice*, and a resident of the port, a maritime privilege arose if the creditor had not been informed of the charter and its terms; because a material-man who deals with one who is actually master of a foreign ship is presumed to deal with him in his character of master, and is not affected by other relations he may have with the owner unless notified of them, nor is he affected by the residence or non-residence of such a master. But in *The Cumberland* it is also held, after the charterer had ceased to be master, and had put another in command, and procured the supplies, there was no lien.

These considerations, it seems to me, dispose of most of the claims upon which I am required to pass, without the necessity of entering upon the question of explicit notice of the terms of the charters, of which there is evidence in respect to some of the creditors, or at least sufficient information to have affected them with notice.

The claims for pilotage are, however, distinguishable from the claims of the material-men. These were for services performed by Chesapeake bay pilots in piloting the ships in and out of the bay on their ocean voyages. As to the inward pilotages, the employment was not in any port, but by the master himself taking the pilot aboard upon the high seas. The service was a necessary one to a ship then upon a voyage, and the state law requires the master of the ship to accept the offered service, or to pay the same charge as if it was accepted. The law regulates the employment, and it takes no account of the residence or non-residence of owners or charterers or their credit. The pilot is compelled to be in readiness to render the service, and the vessel cannot refuse it. The objections applicable to the claims of the other petitioners are not, it seems to me, applicable to these claims for pilotage. It is urged, however, that by delay in enforcing their privilege the pilots have lost their lien, and that by the action of their collector or treasurer they have agreed to look solely to the charterers. None of the claims are older than December, 1886, and the libels were filed about the first of May, 1887. I know of no case, unless there has been a change of ownership, or a loss to the owners attributable to the delay, where so short a period of delay has been held to destroy a lien of this kind. The treasurer of the pilots did take the note of Hart & Co. for a portion of the claims, payable in 60

days, which is now overdue, and is produced; but it was with the express understanding that he would not receipt the bills, and would not give up the lien, unless the note was paid. It has been suggested that the pilot fees belong, not to the pilots performing the service in whose names these petitions have been filed, but to the association of which they are members. The terms of the state law are that the fees shall be paid to the pilot first speaking the vessel. It has been shown that certain of the pilots do pool their earnings, and divide them, after paying out certain agreed items of expense; but there is no proof that, as among themselves, they have agreed to be partners. A mere agreement to divide equally their individual earnings does not make them partners. *Law* v. *Cross*, 1 Black, 533. I hold the claims for pilotage to be liens against the respective steam-ships.

There is one other claim, viz., that of the sail-maker, Mitchell, for the cost of two new try-sails, made for the Kenilworth, which I think is properly to be distinguished from the claims of the other material-men. These two sails were made for the Kenilworth upon the order of the master. The vessel was nearly loaded for a voyage, having come in from her previous voyage with her old sails torn to pieces. Mitchell was sent for, and, either upon the ship or on the wharf, a conversation took place in his presence between the master and one of the firm of Hart & Co., in which the master declared that the vessel was not sea-worthy without the new sails, and that he would not go to sea without them. Mitchell was asked if he could make them in a great hurry, so that the ship could sail by a certain hour, and he agreed to do so. He received the order, and put the sails on the ship on the twenty-second of January last; his bill amounting to $100. Mitchell declares that he knew nothing of any charter, and supposed it was the ordinary case of dealing with the master of a foreign vessel to supply an actual pressing maritime necessity. It is suggested that it is not clear from the language of the charter-party whether the renewal of the sails was one of the expenses to be borne by the charterers, and there is ground for the suggestion. This claim is not entirely free from doubt; but as the vessel has been returned to her owners with the new sails on her, and as the claimant is of that class of artisans favored by the maritime law, I think the doubt should be resolved in his favor.

The decree will be in favor of the claims for pilotage, and in favor of the claim of Mitchell for the sails, and dismissing all the other petitions which were presented at the hearing.