### THE HATTERAS. THE TAMPA. THE NEUSE.

(Circuit Court of Appeals, Second Circuit. December 11, 1918.)

#### Nos. 97–99.

1. MARITIME LIENS ⬤═▷25—FEDERAL STATUTE—TOWAGE—"NECESSARIES."
    Under Act June 23, 1910, § 1 (U. S. Comp. St. § 7783), giving a lien on vessels "to any person furnishing repairs, supplies or other necessaries," towage is not a "necessary," and that service gives no lien on the tow.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Necessaries.]

2. TOWAGE ⬤═▷9—PRESUMPTION OF LIEN.
    While a lien for towage may be created under general maritime law, and there is a presumption of pledge in support of lien, such presumption is rebuttable, and in each case the facts must be examined before a lien can be established.

3. TOWAGE ⬤═▷9—CONTRACT WITH CHARTERER.
    Towage services rendered on request of a transportation company, apparently in its home port, to tow "our barges," without further inquiry, held not to create a lien, where the company was in fact a charterer, bound by the charter to protect the barges from liens.

Appeal from the District Court of the United States for the Southern District of New York.

Three admiralty suits by the New York, Ontario & Western Railway Company against the barges Hatteras, Tampa, and Neuse; the Southern Transportation Company, claimant. Decrees for claimant, and libelant appeals. Affirmed.

The Southern Transportation Company of Philadelphia owned all three of the barges above named, and chartered them all to the New York & Boston Transportation Company of New York by a charter party which was not a demise. This contract contained an agreement that the charterers would keep

the barges "free from all liens of any kind whatsoever during the term of" the charter party, and that the charterers should have no "authority to bind the barge for (inter alia) towage."

During the time of charter, and when the barges were at anchor on Red Hook flats, in New York Harbor, an officer of the charterers called on the telephone the office of libelant, a railway company owning certain seagoing tugs. A clerk in the maritime department of the railroad company answered the telephone, and the charterers' officer inquired, "Will you tow three of our barges, two of them to Providence and one to Fall River?" The answer was in the affirmative, a rate was agreed upon, and agreement made that libelant's tugs were to go to Red Hook and take charge of the barges forthwith. No investigation concerning the relation of the New York, etc., Company to the barges was made, and libelant's agent deposed that he inferred, from the use of the phrase "our barges," that the New York, etc., Company owned the barges to be towed.

Libelant's tugs took the barges to Hammond's Flats, near Throgg's Neck, and it there became necessary to use longer hawsers for towing through the Sound and at sea. It then appeared that the barges had no hawsers proper for this purpose, and of this fact the tugmaster apprised libelant's marine superintendent, who thereupon communicated telephonically with the charterers, and was requested and agreed to use the tug's hawsers.

The vice president of the charterers testified that he conducted this last telephone conversation, and in the course thereof apprised libelant's marine superintendent that the barges were under charter to the New York, etc., Transportation Company, and that the charterers had supposed that proper hawsers came with the boats. This libelant's marine superintendent denied, but admitted that a few days after the towage was completed he was informed by the Southern Transportation Company that they owned the barges, and that bills for the towage had been made out against the several "barges and owners in care of New York & Boston Transportation Company."

The charterers failed to pay the towage bills, as they were admittedly bound to do under the charter party, whereupon libelant filed a libel against each barge, claiming liens for the towage aforesaid because (as alleged in the libels) the "services were necessary for said barge, were rendered upon her credit, and by the general admiralty law, as well as by the Act of Congress of June 23, 1910" (Act June 23, 1910, c. 373, 36 Stat. 604 [Comp. St. §§ 7783–7787]), became "valid and subsisting maritime liens." The District Court held that no liens had been created, and dismissed all the libels, whereupon libelant took these appeals.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (James K. Symmers, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] 1. The contention for a lien under the act of 1910 necessarily rests on the assertion that towage—at least for barges without motive power of their own—must be considered one of the "other necessaries" for which liens are recognized or conferred by the first section of the act (U. S. Comp. St. § 7783).

As to the effect of this statute on existing law, our views are sufficiently expressed in The Oceana, 244 Fed. at page 82, 156 C. C. A. 508; and as to the specific question whether towage is included in the phrase "other necessaries," we think the opinion of Veeder, J., in The J. Doherty (D. C.) 207 Fed. at pages 999, 1000, entirely satisfactory, and adopt the same.

Consequently none of these libels can be sustained under the statute; towage not being a "necessary" within the act.

[2] 2. It is not doubted that under general maritime law a lien for towage may be created, or that there is a presumption of pledge supporting lien, in respect of at least many of the essential assistances to navigation, of which towage is one. The Alligator, 161 Fed. 40.

But such a presumption is rebuttable, and means little more than that the burden of producing evidence to show the facts lies upon him that denies a pledge so natural and frequent as one for (inter alia) towage. Therefore, in respect of towage, the facts must always be examined before any lien can be asserted, as was done in this court in The Sarah Cullen (D. C.) 45 Fed. 511, affirmed 49 Fed. 166, 1 C. C. A. 218, and The Stroma, 53 Fed. 281, 3 C. C. A. 530. For the same principle, see The Wandrahm, 67 Fed. 358, 14 C. C. A. 414.

[3] Upon such inquiries the real question often is that presented by this litigation, viz.: How far may one furnishing services to a vessel, without any actual knowledge of her ownership, agents or charterings, and dealing with some person other than the master, shut his eyes, avoid or neglect all inquiry, and rest upon an authority to contract, which is in essence nothing more than an inference from an apparent act of authority?

We lay aside all decisions concerning liens asserted to rest on dealings with a shipmaster. The authority of a master by virtue of his office is so ancient, extensive, and universally accepted as to give to the "captain's orders" a standing quite different from the agreements of all other agents.

In this instance libelant was plainly employed to perform a service maritime in its nature, the subject of a maritime contract and capable of supporting a maritime lien. But such lien could arise only by the hypothecation express or implied of the credit of the vessel, and that pledge, like any other, must rest on the act of the owner, even though such owner's efficient act consisted only in permitting another to be his agent. While any one who appoints an agent takes the risk of liability growing out of, not only the agent's power, but its abuse, the mere fact of acting like an agent does not make an agent out of the actor.

There are only two states of fact possible in this case. Either libelant was told before any substantial part of the towage service was rendered that the person procuring the towage was a charterer, or else nothing more was known until after services rendered than that the New York & Boston Transportation Company in and of New York, had asked to have "our barges" towed.

The District Court found the first state of facts to be the truth. It came to that conclusion, after seeing and hearing the witnesses, and we perceive no reason to disapprove that finding. If so, there was no lien by general law irrespective of statute, under The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

If, however, we adopt (for argument's sake) the second state of facts, then the libelant was requested by a corporation apparently of New York, and in New York, to tow "our barges." Libelant's infer-

ence from such a request must have been that a New York owner was in his home port seeking to make a contract for towage. But we hold as matter of fact that libelant had no right to infer an ownership from the use of the word "our." It is surely common knowledge that a master, a seaman, a ship's husband, and indeed almost any one connected with the management or upkeep of a vessel, commonly and naturally refers to that vessel in a possessive sense as well as in the feminine gender. In short, this tug owner made no inquiry, literally knew nothing, and sought to know nothing, about the relation of the hirer to the barges. Such circumstances amount to shutting one's eyes to keep out the light, and successfully rebut any presumption of lien.

Decree affirmed, with costs.