## THE SKOMVAER.

### AKTIESELSKABET CHRISTIANSSAND v. W. R. GRACE & CO.

(District Court, S. D. New York. December 19, 1922.)

1. Shipping ⬤⟹181—Charterer takes risk of interruption to lay days not caused by owner or unusual and not to be anticipated circumstances.

   A contract to load and discharge cargo within a certain number of lay days binds the charterer to do so, unless prevented by the owners or by unusual and extraordinary events which were not to be anticipated.

2. Shipping ⬤⟹181—Lay days for loading.

   Days actually used in loading a sailing vessel are not to be excluded from the lay days allowed the charterer because the vessel was also discharging necessary stiffening from another hatch.

3. Shipping ⬤⟹181—Failure of vessel to keep winches in condition for use in loading.

   That winches which a vessel was bound to furnish for use by the charterer in loading were a part of the time not in condition for use entitles the charterer to a deduction from the lay days allowed of only the actual time shown to have been lost thereby.

4. Shipping ⬤⟹50—Agreement by charterer to pay "port charges," including towage, held not to require it to pay towage from the Capes to Philadelphia.

   An agreement by a charterer in the charter party to pay all "port charges" at ports of loading and discharge, including towage, where Philadelphia was named as port of discharge, held not to render the charterer liable for towage from the Capes to Philadelphia, the same being at the charge of the vessel or owners.

   [Ed. Note.—For other definitions, see Words and Phrases, Port Charges.]

In Admiralty. Suit by the Aktieselskabet Christianssand, owner of the bark Skomvaer, against W. R. Grace & Co., with cross-libel. Decree for libelant.

Haight, Smith, Griffin & Deming, of New York City (Clarence B. Smith and Frank A. Paul, both of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Cletus Keating and J. H. Herbert, both of New York City, of counsel), for respondent.

WARD, Circuit Judge. This is a libel and cross-libel arising out of disputes between the owners and charterers of the Norwegian bark Skomvaer. The charter party is dated September 20, 1918, for the carriage of a cargo of manganese ore from Bahia, Brazil, to a United States North Atlantic port to be named on signing bills of lading. The charterers named the port of Philadelphia. The charter is the "United States Shipping Board form under Norwegian sailing agreement."

It is agreed that the charterers were entitled to 20 lay days, Sundays and holidays excepted, and that the rate of demurrage is $528 a day. The owners claim 14½ days' demurrage, whereas the charterers say the boat was loaded and discharged within the lay days and claim the return of 3½ days' demurrage paid under a mistake of fact.

Article 14:

"Cargo to be loaded at the average rate of not less than 250 tons per running day, Sundays and holidays excepted, and to be discharged at the average rate of 250 tons per running day, Sundays and holidays excepted, time reversible, i. e., any time saved at loading port to apply at port of discharge. Charterers to have the privilege of working vessel on Sundays and holidays if they so desire, provided they pay all extra expenses and overtime actually incurred by working cargo in connection with ship and cargo, Sundays and holidays so used not to count as lay days."

The owners also seek to recover the sum of $1,000 deducted by the charterers from the freight, being the sum paid for towage of the bark from the Capes of the Delaware to Philadelphia.

Article 9:

"Charterers to pay all port charges at both loading and discharging ports, including Custom House fees, pilotage, towage, tonnage dues, permanency dues, wharfage, quay or dock dues, boca dues, if any, maintenance dues, on vessel and/or lighters."

The pleadings of both parties originally agreed that the loading at Bahia began October 14th at 7 a. m. This was because the master in a letter dated October 11th to the charterers' agent at Bahia agreed that lay days should begin Monday, the 13th of October (evidently a mistake for the 14th), and subsequently notified the agent that the lay days expired October 25th. But it appearing that the loading actually began October 8th, the court by an order dated November 6, 1919, permitted the libel to be amended to that effect. As the charter party defined the time when lay days should begin, the master had no authority to alter it. Houlder v. Weir, 10 Comm. Cas. 228. Notwithstanding the master's letter, there can be no doubt that lay days did begin October 8th with the loading and continued for four days to the 12th.

The charterers, while insisting that the lay days began October 14th, say that were this not so they did not begin October 12th, October 8th, 9th, 10th, and 11th not being lay days because the bark was discharging stiffening from the main hatch on those days.

They also seek to strike out October 23d to 26th, inclusive, during

which time they say loading was interfered with because the steam winch broke down.

They also seek to strike out October 28th, when there was no loading, and October 29th, when there was loading in the main hatchway only, because of a collision between the charterers' lighter and the stern of the bark, caused by rough weather; and October 30th to November 1st, inclusive, when there was no loading at all, while the bark was being repaired. In this way they reduce the lay days used at Bahia, Sundays being excluded, to nine days.

[1, 2] A contract to load and discharge cargo within a certain number of lay days binds the charterer to do so unless he has been prevented by the owners or by unusual and extraordinary events which were not to be anticipated. In other words, the charterer takes the risk of all other interruptions. Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106. The case of Aktieselskabet Fido v. Lloyd Braziliero (D. C.) 267 Fed. 733, affirmed (C. C. A.) 283 Fed. 62, relied upon by the charterers, has no application. In it the vessels were not ready to receive cargo and their masters refused to do so, whereas in the present case the bark was not only ready to receive but actually did receive cargo October 8th to 12th, inclusive. The charterers say that the bark was not ready because on some of those days, while cargo was going into the fore and aft hatches, stiffening was being discharged from the main hatch. Sailing vessels cannot stand up without stiffening necessary to the safety of both vessel and cargo, and when the charterers agreed to load and unload at the rate of 250 tons a day they must be taken to have known that at some period of the loading and discharging the bark would have to load or discharge her stiffening. Accordingly, October 8th to 11th, inclusive, were lay days.

[3] Article 12 of the charter party reads:

"Master to give free use of vessel's winches, donkey boiler and such tackle as may be on board."

Assuming that the bark was bound to keep the steam winch in order and failed to do so, this would not justify striking out the whole day or all the days as lay days on which she failed to do so. The burden would lie upon the charterers to show to what extent loading and discharging were interfered with by this fact and there is no evidence on the subject whatever. Accordingly, October 23d, 24th, 25th, and 26th must be treated as lay days.

Any interruption as the result of collision was at the risk of charterers. Detention by "default" of a charterer, though it includes his default, does not limit his obligation to load within the lay days except when prevented by the owners or by unusual and extraordinary interruptions. Crossman v. Burrill, supra; Poor on Charter Parties, § 39. October 28th and 29th were lay days, but October 30th to November 1st, inclusive, were not, because the bark was being repaired and was not ready to receive cargo.

Accordingly, I find that all the lay days were used up at Bahia, so that every running day after the vessel was ready to discharge at Philadelphia was a demurrage day.

Although she was not ready to discharge cargo at Philadelphia after being removed from the berth to the stream for the purpose of taking on the necessary stiffening, those days are demurrage days because the charterers named a berth which was so narrow that the stiffening could not be loaded into her there.

Even if the owners were responsible for delay caused by taking on or discharging stiffening or by defects in the steam winch or resulting from collision, still not the whole of such day or days should be stricken out as lay days, but only so much should be deducted from the 250 tons a day as was prevented by these causes.

[4] Coming now to the claim for towage: Article 9 of the charter party puts all port charges upon the charterers. In this commercial document the word "port" means places where cargoes are loaded or discharged in South American and North Atlantic ports. In this case Philadelphia is the discharging port, and I think it means the place within the municipal limits of the city of Philadelphia where cargoes are loaded and discharged. The charterers must pay port towage, but to say that because the regulations of inland navigation, Act of June 7, 1897 (Comp. St. § 7872 et seq.), apply inside of a line drawn from Cape May to Cape Henlopen and because the laws of the state of Pennsylvania require all foreign vessels and American sailing vessels bound to Philadelphia to take a pilot or pay pilotage, the port of Philadelphia extends to the Capes, seems to be fanciful. Upon this reasoning such waters would also constitute the ports of Wilmington, Del., and Chester, Pa., and Gloucester, Camden, and Burlington, N. J. It would also follow that the Skomvaer might have discharged her cargo at Wilmington, Del., or at Chester, Pa., or at Gloucester, Camden, or Burlington, N. J.

Pilotage, generally speaking, is not a port charge at all. It is in the great majority of cases, and probably in all cases of South American and North Atlantic ports, the act of conducting a vessel from the high seas into a port. It is one single charge, not to be split up into so much for pilotage to the port and so much for pilotage in the port.

The word "towage" is associated in article 9 with other charges which are clearly port charges, such as wharfage, quay, or dock charges. The whole towage from the high seas to the port of Philadelphia is sea towage, though a small part of it is within the waters of the port. It is no more to be split into towage to the port and towage in the port than is pilotage to be so split up.

The libelant attached great weight to the practice of owners of tugboats to make out their bills for towage against the vessel towed and owners. But that merely expresses the fact that the tug has rendered a service, which generally speaking is a lien upon the vessel towed and for which the owners are responsible. Certainly when, as in this case, the service was rendered at the request of the master of a foreign vessel coming into the Delaware Bay from sea and the bill was O. K.'d by him, the tugboat owners have a lien. The Hatteras (C. C. A. 2d) 255 Fed. 518, 166 C. C. A. 586. But whether the tug owners had a lien on the bark or not, or whether they had a claim against the charterers or not, has no bearing upon the question presented here, viz. who

is to pay for the towage, as between the owners and the charterers? That question depends upon the construction of the written contract between those parties. As I construe this charter the owners must pay for the towage. The libelant may take a decree for 10 days' demurrage with interest and costs.