**KING v. SMITH et al.**

Circuit Court of Appeals, Fifth Circuit.
March 1, 1929.

No. 5286.

George C. Bedell and Chester Bedell, both of Jacksonville, Fla., for appellant.

B. R. Coleman, of Miami, Fla., Walter F. Rogers, of Jacksonville, Fla., and Scott M. Loftin, John P. Stokes, and James E. Calkins, all of Miami, Fla., and E. J. L'Engle, J. W. Shands, and Edward McCarthy, Jr., all of Jacksonville, Fla., for appellees.

Before WALKER and BRYAN, Circuit Judges, and GRUBB, District Judge.

BRYAN, Circuit Judge. The barge Hammond was seized under admiralty process, and was sold for $4,000. The proceeds of sale were claimed by appellant, King, as owner of the barge, and by appellees Smith and the Hancocks as holders of maritime liens. The decree appealed from allowed to Smith, $3,264.80 as expenses for towage, repairs, and unloading, and $228 as advances for wages to the bargeman; and to the Hancocks $1,158.80 as balance due for towage. The fund in court being insufficient to pay the claims of appellees in full, a pro rata distribution was ordered.

On November 11, 1925, at New York, King entered into a contract with one McBraswell whereby the barge Hammond was chartered for an undetermined period of time at $11 per day. McBraswell obligated himself, among other things, to pay the wages of the bargeman out of the daily charter rate, and to "pay for all towages during the term of the charter and/or for watching, wharfage, supplies or for any other bills, drydocking charges, docking charges or general charges that might become a lien on the said barge." The contract gave to McBraswell an option to purchase one-half interest in the barge, and under certain conditions bound him at King's option to take over the whole barge at a stated price, upon the receipt of which King agreed to execute a bill of sale "free and clear of all liens that may arise from or after the date of this agreement." Appellees base their claims of lien upon contracts with McBraswell. After McBraswell had chartered the barge, he agreed with Smith's agent Rushmore to transport on it

a cargo of freight from New York City to Palm Beach, Fla., partly by the inland water route and partly by sea; and he contracted with the Hancocks for the services of their tug boat Sparrow III for a period of six months at the rate of $50 per day and the cost of fuel, the tug to remain in possession of the owners, and to be employed, first, in doing the inland towing of the Hammond on its voyage to Palm Beach. The Hammond, in pursuance of these contracts, left New York on November 27, 1925, in tow of the Sparrow III, and reached Morehead City, N. C., over the inland route on December 12, 1925.

Rushmore, who testified that he represented Smith in all the transactions pertaining to this case, followed up the shipment, and at Morehead City employed an ocean-going tug to take the Hammond to sea and bring it back to the inland route at Charleston. Upon his orders the Sparrow III left Morehead City on December 18, and proceeded first to Charleston and then to Savannah, at which latter place it remained until December 25, and then proceeded south under McBraswell's orders. Rushmore employed another ocean-going tug at Charleston, which towed the Hammond at sea to the entrance at Palm Beach, and a substitute tug to take the Hammond inside and dock it. Rushmore, as Smith's representative, ordered and paid for all towage performed south of Morehead City, dry-docking and calking the barge en route, and dockage and unloading at destination. He also paid the bargeman $150 as wages, in order to prevent the filing of a libel therefor. Rushmore testified that he paid all these expenses upon his own initiative and without being requested to do so either by King or by McBraswell, but for the purpose of expediting the transportation of Smith's goods. He admitted that he knew King had an interest in the Hammond. The Hancocks claim for towage performed by the Sparrow III up until January 6, 1926, at the rate of $50 per day, or $2,050, and for fuel, $358.80; less $1,250 received from McBraswell on account. They estimate that 70 per cent. of the fuel was consumed in towing the Hammond from New York to Morehead City. *The evidence is consistent with the theory that the Hancocks believed that McBraswell was owner of the Hammond.*

The District Court sustained the claims of appellees on the theory that the charterer of the Hammond was not forbidden to place liens upon it. (D. C.) 17 F.(2d) 118. ▪ Smith through his agent knew that King had an interest in the barge, and was therefore put on inquiry which reasonably

would have resulted in knowledge of the terms of the charter. United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. His rights therefore depend upon the construction of the charter party. McBraswell, as charterer, agreed to pay for all towage and other charges of the nature here involved, and also for general charges that might become liens. In effect, he agreed to prevent the creation of liens by paying off such charges in advance of their becoming liens. He was not permitted by his contract to permit liens to attach and then pay them off, as was held to be the obligation of the charterer in The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386. His obligation not to permit liens was as great as was that of the charterer in the Carver Case, supra, where the provision of the charter party was that the charterer "will not suffer nor permit to be continued any lien," and would in any event pay it off within 15 days. The Supreme Court in that case held that the charterer was not authorized to create a lien on the ship.

Language which requires a charterer to pay a charge before it becomes a lien could hardly be held to be less effective to prevent a lien than language which, while it does not permit a lien to be imposed or continued, recognizes that one may nevertheless exist by requiring the charterer to remove it. The provision in the charter party to the effect that King would warrant against all liens except those that were created under it, in the event of a sale of the barge, does not justify the conclusion that the charterer was authorized to impose a lien, for there are maritime liens against which a vessel cannot be protected by contract. No lien existed for expenses of dry-docking and calking the barge in favor of Smith, for the reason that his agent voluntarily incurred and paid for that expense. The objection to the allowance of the wages to the bargeman is upon the ground that they are excessive, as only the payment of $150 is shown, whereas the decree awarded $228. The counsel for King in his brief does not object to an allowance of the amount of $150 paid to the bargeman, but insists that the evidence did not warrant the decree for $78 additional. However, we accept the finding of the District Court and sustain the decree in that particular. In the view we take of the case, the other charges for towage, repairs, pumping, dockage, and unloading should not be allowed as liens against the barge.

▪ It may be assumed that the Hancocks were without knowledge of the charter par-

892

ty and believed that McBraswell was owner of the barge. They are not entitled to be paid for towage after their tug gave up the towage service for the Hammond. Thereafter they must look to McBraswell under their general contract to do towage work. The amount of $1,250 paid by McBraswell was ample to discharge any lien in their favor upon the barge. It follows that in our opinion it was error to award any amount for the towage service claimed by the Hancocks.

Our conclusion is that $228, with interest, should be paid to Smith to compensate him for wages advanced to the bargeman, and that the balance of the fund in the registry of the court should be paid to appellant.

The decree is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.