## THE WESTERN WAVE.

**NORTH AMERICAN FRUIT & S. S. CORPORATION et al. v. BOARD OF COMMISSIONERS OF PORT OF NEW ORLEANS et al.**

### No. 7594.

Circuit Court of Appeals, Fifth Circuit.
May 20, 1935.

Harry F. Stiles, Jr., of New Orleans, La., for appellants.

Nicholas Callan, Philip S. Pugh, Jr., and Harold A. Moise, all of New Orleans, La., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

These are two libels in rem against the steamship Western Wave; one by the Johnson Iron Works Dry Dock & Shipbuilding Company for repairs, and the other by the Board of Commissioners of the Port of New Orleans for wharfage. The claimant and owner of the ship, the North American Fruit & Steamship Corporation, defended on the grounds that the repairs and wharfage were furnished to the New Orleans, Houston & Corpus Christi Steamship Company, charterer, which was forbidden by the terms of the charter party from subjecting the ship to any liens except for seamen's wages and salvage, and that neither libelant was entitled to a lien on it, because by the exercise of reasonable diligence each of them could have ascertained that the charterer had no authority to bind the vessel. A decree was entered awarding to each libelant a lien on the vessel for the full amounts claimed which admittedly were due and owing by the charterer; and from it the shipowner appeals.

Appellant on March 28, 1931, entered into a charter party for the hire of the steamship Western Wave for the period of one year to the New Orleans, Houston & Corpus Christi Steamship Company. The bare boat was chartered. The charterer agreed to pay all charges, make all necessary repairs, and not to permit any liens except for crew's wages and salvage; to notify any person furnishing repairs, supplies, towage, or other necessaries, that it had no right to create liens therefor; to post on the steamer in a conspicuous place, and to maintain there during the life of the charter, a notice reading as follows: "This steamer is the property of the North American Fruit & Steamship Corporation. It is under Charter to New Orleans, Houston & Corpus Christi S. S. Co. Inc., and by the terms of the Charter neither the Charterer nor the Master has any right, power, or authority to create, incur, or permit to be imposed upon the steamer any liens whatsoever except for crew's wages and salvage."

The charterer was given the option during the life of the charter to purchase the vessel for $35,000. It was also required to keep a copy of the charter party with the ship's papers, and according to the undisputed evidence this was done. At the time the charter party was entered into, the Western Wave was laid up at Walnut street in the harbor of New Orleans, and before being moved copies of the notice were posted in the passageway to the saloon, in the smoking room, in the pilot house, and in the crew's messroom. The charterer was incorporated by two brothers, N. L. Proctor, who became president, and J. C. Proctor, who became vice president. The former acted as master of the

Western Wave and the latter as manager. J. C. Proctor arranged with Neil Armstrong, superintendent of the Johnson Iron Works, whom he had known for many years, to make certain repairs to the vessel which were necessary before it could be put into commission and engage in the carrying trade for which it had been chartered between New Orleans and other Gulf ports. He testified he told Armstrong that he and his brother were chartering the ship from appellant, and Armstrong agreed to make repairs on the credit of the Proctors and their newly formed corporation. Armstrong denied that this was the arrangement, and said J. C. Proctor told him that he and his brother, acting for the corporation which they had just organized, had bought the ship. Armstrong knew that appellant had theretofore been the owner, because as superintendent of the Johnson Iron Works he had been accustomed to make all repairs to it for appellant; but he said that he did not see any of the posted notices, and accounts for this by the circumstance that none of them was placed in the engine room where the repairs ordered by Proctor were made. A newspaper article published in New Orleans stated that according to an announcement made by J. C. Proctor steamship service would soon be inaugurated by the Proctor Company between New Orleans and other Gulf ports; and added that the new company had purchased the Western Wave. That article is relied on to discredit J. C. Proctor and to corroborate Armstrong, and further as justification for the belief on the part of the Johnson Iron Works that it would have a maritime lien on the vessel; but it was published after Armstrong agreed to make the repairs. Appellant had a local representative at New Orleans by the name of Campbell, who acted during the time the vessel was chartered also as bookkeeper and auditor for the charterer. Campbell knew that Armstrong, for the Johnson Iron Works, was making the repairs, and he knew also that the Board of Commissioners of the Port of New Orleans, commonly called the "Dock Board," was furnishing wharfage space; but he kept silent as to the terms on which the Western Wave was turned over to the Proctors and their corporation, and as to the continued ownership of the vessel by appellant. The Dock Board does not claim to have been misled into extending credit to the charterer. It is a public agency of the state of Louisiana, vested by law with complete jurisdiction of the public wharves of the Port of New Orleans, and with authority to establish and collect charges for the use of all facilities administered by it. Ulster S. S. Co. v. Board of Commissioners of Port of New Orleans (C. C. A.) 299 F. 474. It stands on its published tariffs which provide that the ship is responsible for all charges for use of the public wharves, and takes the position that it has a maritime lien on the Western Wave for wharfage, regardless of the ownership of that vessel or of the authority of the person in custody of it.

The Johnson Iron Works in our opinion did not acquire a maritime lien, because by the exercise of reasonable diligence it could have ascertained that J. C. Proctor had no authority from the owner to bind the vessel for the repairs which were made upon his order. 46 USCA § 973. Armstrong, according to his testimony, which the District Court apparently accepted in preference to that of Proctor, had known appellant as owner of the Western Wave. Reasonable diligence on his part, upon being told by Proctor that he and his brother had bought the ship, would have required an examination of the ship's papers, and such an examination in turn would have revealed the truth that neither Proctor nor the new company had authority to place a lien upon the ship for repairs. An inquiry of Campbell, the local agent, would have resulted either in a denial of Proctor's claim of ownership, or in the Johnson Iron Works being in a better position to assert the claim now made of fraud and deception. The newspaper article could not have influenced Armstrong to enter into the contract for repairs, since it was published after that contract was made. The evidence strongly suggests that Armstrong intentionally refrained from seeking information from Campbell, and that Campbell as deliberately and carefully refrained from volunteering any information to Armstrong. But the statute places the burden of exercising diligence upon the furnisher of repairs, and not upon the owner or his agent; and so we have here no question of estoppel of the owner to assert the truth. The charter party was on board among the ship's papers where it was required by the owner to be kept, and where it was open to inspection. Under the undisputed facts, the Johnson Iron Works was chargeable with knowledge that the vessel was under charter, and of the

terms of that charter. United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361.

We are of opinion also that the Dock Board, because of its failure to make inquiry as to the charterer's authority, and because of the charterer's lack of authority to bind the vessel, has no maritime lien for wharfage. By the general maritime law, without the aid of a statute, liens are given for necessaries furnished upon the credit of a foreign vessel. The Roanoke, 189 U. S. 185, 23 S. Ct. 491, 47 L. Ed. 770. Among these necessaries are wharfage, Ex parte Easton, 95 U. S. 68, 24 L. Ed. 373; pilotage on the high seas, Id.; and on inward and outward voyages, The Pirate (D. C.) 32 F. 486; stevedoring, El Amigo (C. C. A.) 285 F. 868; Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157; and of course seamen's wages and salvage. By the Maritime Lien Act of 1910, 36 Stat. 604 [46 USCA § 971 note] Congress provided that: "Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." After the passage of this act it was held in the Second circuit that towage was not included within its provisions. The J. Doherty (D. C.) 207 F. 997; The Hatteras (C. C. A.) 255 F. 518. The case last cited was decided in 1918, and in 1920 the act of 1910 was amended to include towage by name, and so as to read: "Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries," etc. 46 USCA § 971. Section 973 of the same title provides: "But nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." In Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, it was said at page 11, 41 S. Ct. 1, 4, 65 L. Ed. 97, that the

purpose of the act of 1910 was: "First, to do away with the artificial distinction by which a maritime lien was given for supplies furnished to a vessel in a port of a foreign country or state, but denied where the supplies were furnished in the home port or state. * * * Second, to do away with the doctrine that when the owner of a vessel contracts in person for necessaries or is present in the port when they are ordered, it is presumed that the materialman did not intend to rely upon the credit of the vessel, and that hence no lien arises. * * * Third, to substitute a single federal statute for the state statutes in so far as they confer liens for repairs, supplies and other necessaries." While the acts of 1910 and 1920 were not intended to take away any maritime lien, Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., supra; New Bedford Dry Dock Co. v. Purdy, 258 U. S. 96, 42 S. Ct. 243, 66 L. Ed. 482; Marshall & Co. v. S. S. President Arthur, 279 U. S. 564, 49 S. Ct. 420, 73 L. Ed. 846, they were intended to require those who furnish necessaries to vessels, as conditions precedent to the existence of liens, to use reasonable diligence to ascertain that the persons ordering necessaries have authority to bind such vessels. We think the statutory words "other necessaries" should not be narrowly interpreted as was done in cases like The J. Doherty, The Hatteras, supra, The Muskegon (C. C. A.) 275 F. 348, The Suelco (D. C.) 286 F. 286, but that they should be given a broad meaning, as they were in The Rupert City (D. C.) 213 F. 263, and The Henry S. Grove (D. C.) 285 F. 60, and held to include maritime services generally, at least in so far as port charges are concerned, whether such services consist of the furnishing of labor or material. If materials only were furnished, there would be no need to add anything to the words repairs and supplies. Towage was included under the circumstances we have already stated, and we see no reason why other maritime services, such as stevedoring, pilotage, and wharfage should not be, since they all give rise to maritime liens. In King v. Smith, 30 F.(2d) 890, this court rejected a claim of lien for wharfage because the lien claimant's agent knew that the owner had some interest in the libeled barge, and was therefore put on inquiry as to the extent of that interest, as disclosed by the charter party. The ruling was not much discussed, it is true, but it was made because of section 973, and of the decision

in the Carver Case, supra, which we think is controlling here.

The decrees are reversed, and the causes remanded for further proceedings not inconsistent with this opinion.