W. A. MARSHALL & COMPANY, INCORPORATED,
*v.* S. S. " PRESIDENT ARTHUR," ᴇᴛᴄ.

No. 272.   Argued February 27, 1929.—Decided May 20, 1929.

*Mr. George Wright Hinckley* for petitioner.

*Messrs. John M. Woolsey* and *Samuel D. Stein,* with whom *Mr. Saul S. Myers* was on the brief, for respondent.

Mr. Justice Sanford delivered the opinion of the Court.

In May, 1925, W. A. Marshall & Co., Inc., filed a libel in admiralty in the federal District Court for Southern New York against the Steamship " President Arthur," asserting a maritime lien thereon for an unpaid balance of the purchase price of bunker coal furnished by it on the request of the owner to and for the use of the steamship. The owner, the American Palestine Line, Inc., answered as claimant, denying that the Company had a lien on the steamship and alleging that the entire purchase price had been paid in accordance with the contract of sale.

At the hearing the District Court held, on the evidence, that the Company had no lien on the vessel, and dismissed the libel. 22 F. (2d) 584. This decree was affirmed by the Circuit Court of Appeals. 25 F. (2d) 648.

The evidence—which is undisputed—shows that when the negotiations were entered into for the coal the Line wished to pay for it on longer terms than were usually granted, and that the Company, after investigating the standing of the Line, not believing that it was financially responsible, and wanting additional security, required the Line to give trade acceptances endorsed by responsible and acceptable persons; with the purpose that, if needed at any time, the money could be obtained by discounting the acceptances, thus endorsed, prior to their maturity.

Thereupon, in February and March, 1925, the parties entered into two written contracts for the coal. Each of these provided that the Company should sell and the Line, as owner of the steamship, should buy, at a specified price, a designated amount of coal " to be used as bunker coal for " the steamship, and to be delivered on specified dates. Each provided that the Line should " pay for the said coal as follows: By delivering " to the Company two trade acceptances, dated the date of the delivery of

the coal, due March 10 and May 8, respectively, and "endorsed by Jacob Wacht, Jacob S. Strahl and Joseph W. Gottlieb." Neither contract referred to any lien on the vessel; and each recited that ":The entire contract between the parties is stated above and there is no outside condition, warranty, agreement, or understanding." At the foot of each contract the persons named as endorsers also signed an agreement reciting that "In consideration of the execution of the foregoing contract" and the delivery of the coal to the Line and of one dollar, they jointly and severally agreed to endorse the trade acceptances described in the contract.

Without the consideration of such endorsements, it was shown, the Company would not have sold the Line the coal.

The coal called for by the contracts was delivered to the steamship. The purchase price amounted to $21,736.16. For this the Line gave the Company its two trade acceptances endorsed by the three designated persons; these being consolidations of the four acceptances required by the two contracts. The acceptance for $11,794.54, first maturing, was duly paid. The acceptance for $9,382.62, maturing later, was not paid and was protested. This was the amount of the balance for which the Company claimed a lien.

After filing the libel, the Company also brought a civil action upon the unpaid acceptance in a state court, against the endorsers only. This is still pending and undetermined.

The questions presented here are: Whether under the contracts the Company waived the maritime lien which it would otherwise have had on the steamship to secure the payment of the purchase price; and, if not, whether the delivery of the endorsed acceptances constituted under the contracts payments of the purchase price which extinguished the lien.

1. As to the first of these questions it is necessary to consider the provisions of the Maritime Lien Act of 1910,[1] relating to liens for necessaries, which were reenacted in the Ship Mortgage Act of 1920.[2] Subsec. P of the latter Act provides that: "Any person furnishing repairs, supplies . . or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." Subsec. S provides that: "Nothing in this section shall be construed to prevent the furnisher of repairs, supplies . . or other necessaries . . from waiving his right to a lien . . at any time, by agreement or otherwise. . ." [3]

Prior to the Act of 1910 it had been settled that by the maritime law as administered in this country a lien was given for necessaries furnished a vessel in a port of a foreign country or state upon the credit of such vessel; but that no such lien was given for necessaries furnished in the home port or state. *The Roanoke,* 189 U. S. 185, 193.

The purpose of the Act of 1910, as shown by the Reports of the Committees of Congress, was to do away with this " artificial distinction " and " the doctrine that, when the owner of a vessel contracts in person for necessaries or is present in the port when they are ordered, it is presumed that the materialman did not intend to rely upon the credit of the vessel, and that hence, no lien arises "; and " to substitute a single federal statute for the state statutes in so far as they confer liens for repairs, supplies and necessaries." *Piedmont Coal Co.* v. *Seaboard Fisheries Co.,* 254 U. S. 1, 11.

---

[1] 36 Stat. 604, c. 373.

[2] This is the separate designation of § 30 of the Merchant Marine Act of 1920, 41 Stat. 988, 1005, c. 250.

[3] U. S. C., Tit. 46, §§ 971, 974.

To this end the Act gave a maritime lien on any vessel, whether foreign or domestic, for necessaries furnished on the order of the owner or his authorized agent, and relieved the libellant from the necessity of alleging or proving that credit was given to the vessel. The Committee reports show, however, that it was not intended to make any other change in the general principles of the existing law of maritime liens, *Piedmont Coal Co.* v. *Seaboard Fisheries Co., supra,* p. 11; and the specific provision that the Act should not be construed as preventing the furnisher of the necessaries from waiving his right to a lien, " by agreement or otherwise," indicates clearly, we think, that it was not intended to change the principles of the maritime law in respect thereto. That an express renunciation of the lien is not essential, is plain.

We need not enter here into the general field of the waiver of maritime liens. Such liens differ in their character and are not equally favored—the lien for necessaries, which is a secret one, being *stricti juris, Piedmont Coal Co.* v. *Seaboard Fisheries Co., supra,* 12. It suffices to say that we think the principles applicable to the question whether the lien was waived by the contracts entered into here, are aptly indicated in the following cases, which, in the main, were analogous in their facts to the present case, and were decided by members of this Court, sitting at circuit.

In *Murray* v. *Lazarus,* 1 Paine 572, 17 Fed. Cas. 1049, 1051 (1826), the libellants made a special agreement with the master for the payment of their advances for repairs and supplies furnished the vessel in a foreign port, and took from him a bill of exchange drawn upon the agents of the owner. Thompson, Circuit Justice, in holding that the libellants had no lien for these advances on the freight monies received by the owners, said: "When an express contract has been entered into for the payment of such

expenses, that must be resorted to, and will be considered a waiver of such implied lien if any existed. And a party who has waived his right in this respect cannot be permitted, at a subsequent time, and under a change of circumstances to reinstate himself in his former condition to the injury of others . . . If this is to be considered a regular and ordinary bill of exchange, it was a substitution for any lien that might have existed, and must be considered a relinquishment thereof."

In *Phelps* v. *The Camilla,* Taney, 400, 19 Fed. Cas. 441, 445 (1838), the libellants furnished the agents of the vessel in a foreign port copper which was used in repairing the vessel. The sale was made on a written order of the agents that made no mention of the vessel or her owners. The copper was charged to the agents, and they gave the libellants their negotiable note, which was not paid. The libellants claimed that the charge to the agents had been made by mistake, and some months later changed the account on their books and charged the copper to the ship and her owners. Taney, Circuit Justice, finding upon the evidence that the copper was sold to the agents upon their personal credit and was not furnished upon the credit of the brig and her owners, held that the libellants had no lien, but added: " It must not, however, be understood, that the decision would be different, if the copper had been originally charged to The Camilla and her owners. It is true, that upon such a sale, the libellants would, in the first instance, have acquired a lien upon the brig; but that lien, in my opinion, would have been waived by taking afterwards the note of [the agents]. . . If the party does not choose to rely on the contract which the maritime law implies in such cases, but takes an express written contract, he must rely on the contract he makes for himself, and cannot, upon a change of circumstances, resort to the securities upon which, in the absence of any special

agreement, the law presumes that he relied; and if he takes a note or bill of exchange, or any other personal engagement, for the payment of the debt, he is presumed to rely on this personal security, and to waive his lien, unless he stipulates that the liability of the vessel shall still continue."

In *Leland* v. *Medora,* 2 Woodb. & M. 92, 15 Fed. Cas. 298, 299 (1846), Woodbury, Circuit Justice, speaking of the lien for repairs on a vessel, said that "if the evidence . . shows, that the ship was not relied on originally, though foreign, but the master or owners or other security were, the lien does not attach any where, or under any form. *The Maitland,* 2 Hagg. Adm. 253; *The Nestor* [1 Sumner (U. S. C. C.) 73]."

In *The Ann C. Pratt,* 1 Curt. 340, 1 Fed. Cas. 947, 950 (1853), Curtis, Circuit Justice, in holding that there was no maritime lien for advances to the master of the vessel in a foreign port to make necessary repairs that had been secured by a void bottomry bond, said, citing *The Nestor* and other cases, " that the lien created by the maritime law may be, and is, waived by the creditor, by any act or contract which is inconsistent with an intention to receive or retain that lien."   The decree in this case was affirmed in *Carrington* v. *Pratt,* 18 How. 63, 68, in which this Court said that " it is well settled that the lien implied by the general admiralty law, may be waived by the express contract of the parties, or by necessary implication; and the implication arises in all cases where the express contract is inconsistent with an intention to rely upon the lien.   A familiar instance is where the money is advanced or repairs made, looking solely to the personal responsibility of the owner or master."

In *Taylor* v. *The Commonwealth,* 23 Fed. Cas. 756, 757 (1875), the libellant, before making repairs on the vessel

at her home port, had entered into a written contract specifying that they were to be paid for partly in cash and partly in endorsed notes, that is, negotiable notes, with personal security. Miller, Circuit Justice, in holding that under these circumstances there was no lien on the vessel for the repairs, said: " I have no doubt of the fact that a man doing that kind of work may rely on the owner of the vessel, and that if he makes no specific contract on the subject, he will have a right against the owner and the vessel . . ; but that is a lien which the law implies from the circumstances, and if a specific contract is made which shows that the party relied upon other security and other modes of payment, then he cannot enforce the admiralty lien. It is very clear to me, here, that [the libellant] in making this contract, never intended to rely on the security of the vessel itself, because he made this contract for the very best kind of other payment. . . I think, having made an express contract for an express security, he cannot say, ' I did this work on the credit of the vessel.' In other words, I think if there is any question of admiralty lien, that it must have been the intention in the mind of the party who furnishes the supplies and repairs whether in a home or foreign port, to rely on the credit of the vessel. . . If it can be shown that he did not rely on that alone, and that he intended to rely on other security, which he supposed sufficient, or which was supposed to be better, then he had no lien, because the lien arises from implication, from the fact expressed or implied that the man in furnishing the supplies or contracting a debt, relied on the vessel as security, and if he relied on anything else it is another security sufficient, or supposed to be, which, in case that turned out to be insufficient, does not restore his lien."

In the present case the libellant, being unwilling to sell the coal to the owner for the use of the vessel without per-

sonal security for the payment of the purchase price, before furnishing the coal made contracts which specifically provided that the owner should "pay for" the coal at the time of its delivery by trade acceptances endorsed by three designated persons, who in consideration for the contracts agreed to endorse the acceptances. Neither of the contracts provided for any lien upon the vessel; and each, on the contrary, specifically recited that it stated the entire contract between the parties and that there was no outside agreement or understanding. Furthermore, upon the delivery of the coal, the libellant accepted the trade acceptances endorsed by the designated persons, and when it filed the libel against the vessel still retained the unpaid acceptance, on which later it brought suit against the endorsers.

Applying the principles stated in the foregoing cases, we think that the libellant, having made specific contracts for an express security, instead of resting on the lien which the law would otherwise give, must rely on the contracts it made for itself, and cannot now, in a change of circumstances, resort to the lien it would have had in the absence of the special agreements; and that by taking other and different security, upon which it relied, and which it still retains, without stipulating for the retention of the lien, it has waived the lien which it otherwise would have had.

2. Holding that the lien was waived, it becomes unnecessary to determine whether the deliveries of the endorsed acceptances constituted under the contracts payments of the purchase price which would have extinguished the lien.

The decree is

*Affirmed.*