## In re MARINE TRANSIT CORPORATION et al.

District Court, S. D. New York.

Aug. 19, 1937.

McManus, Ernst & Ernst, of New York City (Lester D. Melzer, of New York City, of counsel), for trustee.

Louis Mead Treadwell, of New York City (Bernard J. Thole, of New York City, of counsel), for claimant.

LEIBELL, District Judge.

This is a petition by the Irving Trust Company, trustee in bankruptcy of the Marine Transit Corporation and the General Marine Transit Company Inc., to review an order, dated May 10, 1937, made by Hon. Peter B. Olney, Jr., referee in bankruptcy, allowing certain lien claims of the Socony-Vacuum Oil Company, Inc., and the Vacuum Oil Company, Inc. The bankrupt Marine Transit Corporation was the owner of a fleet of tugs and barges, and the bankrupt General Marine Transit Company, Inc., was engaged in the business of operating the said fleet of tugs and barges in the New York State Canal trade.

On May 21, 1934, Marine Transit Corporation filed a petition in bankruptcy and was adjudged bankrupt. On the following day General Marine Transit Company, Inc., also filed a petition and was adjudged bankrupt. At that time in an application to the court for an order permitting it to file its voluntary petition in bankruptcy unaccompanied by a statement of assets and a list of creditors, the General Marine Transit Company, Inc., declared that it is a wholly owned subsidiary of the Marine Transit Corporation. Apparently both these proceedings were later consolidated as indicated by the above caption.

The claims under review are asserted as maritime liens pursuant to the Merchant Marine Act 1920, § 30(P), 46 U.S.C.A. § 971, the indebtedness being for oil, etc., delivered by the Standard Oil Company of New York, Inc. (predecessor of the Socony-Vacuum Oil Company), and the Vacuum Oil Company (which has since merged with the Socony-Vacuum Oil Company) to the tugs and barges owned by the Marine Transit Corporation and operated by the General Marine Transit Company, Inc.

On or about May 26, 1934, the Vacuum Oil Company, Inc., filed a claim for $635.36 for deliveries of lubricating oil made between November 27, 1933, and February 28, 1934, to certain motorships of the bankrupts.

On September 21, 1934, the Socony-Vacuum Oil Company, Inc., filed two claims; one for $3,989.29 for deliveries of oil made between September 21, 1932, and December 8, 1932, and one for $1,433.66 for deliveries of oil made between October 28, 1933, and December 30, 1933, all to certain vessels of the bankrupts.

Pursuant to orders of this court, the trustee sold all of its right, title, and interest in and to certain tugs and barges of bankrupts' fleet, free and clear of any and all liens existing against any of the said vessels, such liens to be transferred to and attach to the proceeds of the sale of the said vessels.

On February 6, 1936, an order was entered by the referee directing all persons claiming liens on any and/or all of the said tugs and barges to file notice of claim thereof on or before March 10, 1936, and further directing that all persons failing to so file such notice of claim of lien be forever barred from asserting such lien.

Notice of the entry of said order was duly published and was served upon Socony-Vacuum Oil Company, Inc. Apparently there was no service upon the Vacuum Oil Company as a separate entity because it had merged with the Socony-Vacuum Oil Company, Inc., prior to the date of the entry of the order. On March 9, 1936, Socony-Vacuum Oil Company, Inc., refiled two claims of liens, viz., one for $3,989.29 and one for $1,433.66; the claim for $635.36 was not refiled as a lien claim. However, on October 1, 1936, the referee granted a motion to amend this general claim of $635.36 so as to assert a maritime lien therefor.

I. The claim of Socony-Vacuum Oil Company, Inc., for $3,989.29. This claim in the sum of $3,989.29 was first filed herein September 21, 1934, and states "that the consideration for said debt is as follows: merchandise sold and delivered as per itemized statement attached; that no part of said debt has been paid; that there are no set-offs or counterclaims to the same; that no judgment has ever been recovered thereon; and that the only security for said debt held by said corporation are maritime liens against the following named vessels of the Marine Transit Corporation: On the vessel Lowery for $64.89; on the Express for $607.99; on the Olsen for $184.04; on the Sterling for $825.01; on the Empire for $960.99; on the Sidway for $694.42; on the Craig for $651.95; for supplies and necessities consisting of fuel oil furnished them on the credit of said vessels for the said amounts respectively as per statement attached and it is not intended hereby to waive said liens or any rights which it has or may have thereunder."

There is a statement annexed to the claim giving the names of the motorships to which the oil was supplied, the quantities, dates, price, and total cost of each delivery.

Later, on March 9, 1936, this claimant refiled its claim specifying further facts on which it based a claim to a maritime lien and added a statement:

"Prior hereto claimant duly filed an ordinary bankruptcy claim, verified the 21st day of September, 1934, for $3,989.29 alleging as security maritime liens on the above named vessels and reserving all lien rights in the filing of said claim.

"That this claim is made pursuant to an order dated February 7, 1936, providing that all persons claiming liens file notice of claim thereof, duly verified, with the Referee on or before the 10th day of March, 1936."

This was allowed by the referee in the sum of $3,132.37 as a lien claim and as a general claim in the sum of $856.92. The reason for the distinction was that deliveries in the latter amount were made to certain tugs and barges of the bankrupt which "were not sold and so did not produce any of the fund on which a lien could attach."

In respect to this claim the trustee contends:

(a) The claimant is guilty of laches under the doctrine of the Owyhee Case, 66 F.(2d) 399 (C.C.A.2), and thereby lost any maritime lien which it may have had; (b) the claimant waived any lien which it may have had by its subsequent course of conduct; (c) the claimant released the bankrupt from this indebtedness and accepted a new debtor in its place—the National Motorship Corporation— and at the time of the filing of the petition in bankruptcy herein, no amount was due claimant upon this claim. It is contended by the trustee that the said claim should have been disallowed as a lien claim, and as a general claim in toto.

The Merchant Marine Act 1920, § 30 (P), 46 U.S.C.A. § 971, provides for maritime liens for necessaries furnished any vessel. Although this provides no period of limitation in which an action may be brought for the enforcement of a lien, section 83 of the Lien Law of New York, chapter 38, Laws 1909 (Consol.Laws, c. 33), sets forth a twelve-month period of limitation. It

was held in The Owyhee (C.C.A.) 66 F.(2d) 399, that the state statute did not bar a maritime lien claimed under the federal act, but furnished a guide for determining what effect should be given the failure to make timely assertion of the lien. The court, at page 401 of 66 F.(2d), said:

"The New York statute furnishes a comparative test for giving effect to time elapsed beyond it, and marks the boundary between the period when liens may be enforced regardless of the time when the action is brought and the period where some explanation of the delay is required. As time runs on beyond the statutory period, excuses must be good enough to justify the delay, be it long or short."

The excuse offered by the claimant, and accepted as justifiable by the referee, was that a method of payment was agreed upon by the parties. This plan arose under the following circumstances:

In 1932 a corporation known as the National Motorship Corporation, apparently affiliated in some way with these bankrupts, was indebted to the Standard Oil Company (the predecessor of the claimant, the Socony-Vacuum Oil Company, Inc.) in the sum of $5,183.52, and the bankrupt Marine Transit Corporation was indebted to the Standard Oil Company to the amount of this claim, $3,989.29.

On January 7, 1933, when the General (sic, should be National) Motorship Corporation and the Marine Transit Corporation were indebted to the Vacuum Oil Company for $3,102.53 and to the Standard Oil Company for $9,137.84, Courtland Palmer, who was the attorney for said companies and secretary of National Motorship Corporation, wrote the Standard Oil Company suggesting that the said indebtedness be paid off either by a sale of the Diesel Lighter Express, owned by the National Motorship Corporation to the Standard Oil Company, the proceeds "to be applied, first, to the payment of the amount due to you, and the balance to be applied either to future purchases made by them from you, or on some basis agreeable to both parties. Or the debtors will charter the Lighter to you at the rate of $30.00 a day for a period of one year or longer, and the charter hire of the said vessel to be applied by you monthly in reduction of the amount due to you from the said debtors."

This suggestion led to the execution of a charter party on March 10, 1933, by the National Motorship Corporation as owner of the Express and Standard-Vacuum Transportation Company (apparently a subsidiary of the Standard Oil Company) as charterer. The terms of the charter party called for the payment of $15 a day by the charterer, for five days a week, the charterer having the right to terminate the charter on twenty-four hours' notice. The fourteenth paragraph of the charter party reads as follows:

"(14) The Charterer shall pay hire monthly to Standard Oil Company of New York, Inc., Fuel Oil Department, in reduction of an obligation now due them from the Owner until such time as the Charter is cancelled or the full amount thereof is paid, and in the event of the continuance of this Charter, after the aforesaid obligation shall be fully paid, the Charter Hire shall then be paid to the Owner."

Later when a settlement of some admiralty suit was consummated, Mr. Courtland Palmer, representing the libelant, General Marine Transit Company, Inc., wrote (November 10, 1933) a firm of attorneys who represented the Standard Oil Company, owner of certain tugs, as follows:

"This is to confirm settlement of the action of General Marine Transit Co., Inc. against the tug Mexpet, and tug Socony 28, in which the Socony 28 was solely held at fault for the sum of $4,750.00.

"The General Marine Transit Co., Inc., does not owe any money to the Standard Oil Company of New York, for oil or gasoline except on its current account, which is kept up to date. It is a separate and distinct corporation, having no relation to the Marine Transit Corporation, who owe money to the Standard Oil Company of New York.

"With reference to the amount owed by the Marine Transit Corporation, that account is secured by the charter of the Diesel Lighter Express, which we have chartered to the Standard Transportation Company, at the bareboat rate of $15 a day. This charter hire is applied monthly to the payment of the account of the National Motorship Corporation and the Marine Transit Corporation. The Express is owned by the National Motorship Corporation, but we made the charter at a low rate, giving a distinct advantage to the Standard Oil Company of New York, and had the charter hire applied not only to the account of the National Motorship Corporation, but to the account owed by the Marine Transit Corporation. The Standard Oil is thus secured for the

payment of the sums due by the Marine Transit Corporation and the National Motorship Corporation, and, therefore, there is no reason why any deduction should be made from the settlement above referred to.

"In any event, there would be no right to withhold the settlement or to make any deduction from the settlement. As before stated, the General Marine Transit Co., Inc. is a distinct operating company and not liable for the obligations of the Marine Transit Corporation.

"Will you kindly, therefore, have the check made payable to the order of Courtland Palmer, Proctor, in settlement of this litigation, and I will deliver to you the usual satisfaction of decrees."

When Mr. Palmer was a witness before the referee herein in respect to this claim, he testified as follows:

"The $15 a day was to be used first, to pay the indebtedness of the National Motorship Corporation and then when that was completed to pay the indebtedness of the Marine Transit Corporation.

"By the Referee:

"Q. How could that be used to pay the indebtedness of the Marine Transit Corporation? A. The idea being the National Motorship Corporation would pay the indebtedness of the Marine Transit Corporation, would debit the Marine Transit Corporation with the amount of the payments and the Marine Transit Corporation was to pay them back.

"Before that came to a conclusion and while the boat was on charter to the Standard Oil Company and before the National Motorship Corporation indebtedness was paid, the equity receivers were appointed for the National Motorship Corporation and about April, 1934, and at the time that the charter hire had run a sufficient amount of time to pay the full amount of the indebtedness of the National Motorship Corporation, then the Receivers refused to allow it to go on to pay the debt of the Marine Transit Corporation.

"Q. Let me ask you this: By virtue of what right did you assume to bind the National Motorship Corporation to pay the indebtedness of the Marine Transit Corporation? A. It was an arrangement made by me for the officers of the National Motorship Corporation and the Marine Transit Corporation at the time, and they consented to the arrangement."

Mr. Palmer further testified as follows:

"Q. Was there ever any application of the charter money which would have otherwise been paid to the National Motorship Corporation,—was there any of it ever applied as against the indebtedness of the Marine Transit Corporation as distinguished from the National Motorship Corporation,— you say first it was to be applied against the indebtedness due by the National Motorship Corporation to the Standard Oil Company and then to the indebtedness of the Marine Transit Corporation?

"Now, did it ever get so far that the National Motorship Corporation indebtedness was wiped out and they started to wipe out the other indebtedness? A. May I explain it this way: My answer would be no, but that is not altogether of my knowledge. Whatever date in April the Receivers were appointed for the National Motorship Corporation they took over the National Motorship Corporation and the right to take over the tug Express and when it took that over the Express was under charter to the Standard Oil Company and, as I recall, it continued under charter until the full debt of the National Motorship Corporation was paid.

"Then the Receivers demanded the boat back and got it back, and nothing was applied to the Marine Transit Corporation. I believe that is a correct statement of the facts. To be more accurate, nothing was applied on account of the Marine Transit Corporation debt to the Socony, the Standard Oil Company."

The attorney for the claimant in this proceeding made the following statement on the record:

"The Receivers stated that no part of the charter hire would be allowed to be applied against the indebtedness of the Marine Transit Corporation because that was a separate indebtedness and that the charter hire, if the boat was to be used by the Standard Oil Company, was to be paid direct to the National Motorship Corporation.

"We refused to enter into that charter arrangement and around April 8, 1935 surrendered the boat to the Receivers. At no time was the indebtedness of the Marine Transit Corporation paid by any charter hire, coming from the charter hire of the tug Express."

On these facts, I am of the opinion that the claimant waived any lien which it may have had by its subsequent course of conduct

in respect to the charter of the Express (Marshall & Co. v. The President Arthur, 279 U.S. 564, 568, 49. S.Ct. 420, 73 L.Ed. 846); that the claimant looked to the charter as security for its said claim herein in place of its maritime lien (Phelps v. The Camilla, 19 Fed.Cas. p. 441, No. 11,073), but did not release the bankrupt Marine Transit Corporation from the indebtedness.

■ The trustee contends that the facts indicate that the National Motorship Corporation assumed the indebtedness of the Marine Transit Corporation to the Standard Oil Company, because the Standard Oil Company made entries in its books recording the National Motorship Corporation as its debtor for the amount of the claim, until the National Motorship Corporation went into receivership, when the entries were again reversed and the Marine Transit Corporation was again shown as the debtor of the Standard Oil Company. But there is no proof that the National Motorship Corporation and the Marine Transit Corporation made corresponding entries in their books, showing respectively that the National Motorship Corporation was indebted to the Standard Oil Company for the amount of the claim herein and that the Marine Transit Corporation was indebted to the National Motorship Corporation for a similar amount. If the charter party had continued long enough for the rentals to pay off the original indebtedness of $5,183.52 of the National Motorship Corporation to the Standard Oil Company and then to be applied in payment on account of the indebtedness of the Marine Transit Corporation to Standard Oil Company, as to any such payments on account, the Standard Oil Company would have no claim against the Marine Transit Corporation and the National Motorship Corporation would have a claim against the Marine Transit Corporation. The record does not show that the Marine Transit Corporation has filed a claim herein for any part of the $3,989.29 and if it had done so it would have been dismissed for lack of consideration. Nor does the record show that the Standard Oil Company filed a claim for this amount against the National Motorship Corporation in the equity receivership of that corporation. The Standard Oil Company has filed a claim for that amount in this proceeding and is listed as a creditor in the schedule of liabilities herein. Bankruptcy proceedings are in equity and it seems to me that the court would be doing an inequitable thing if it denied this claim for $3,989.29 altogether.

It should be allowed as a general claim. In view of my conclusion that the claimant waived its lien, it is unnecessary to consider the question of laches.

■ II. The claim of Socony-Vacuum Oil Company, Inc., for $1,433.66. This was allowed by the referee in the sum of $1,394.66 as a lien claim; $39 was not so allowed because it did not represent oil delivered to the boats sold by the trustee in bankruptcy. The oil, etc., upon which this claim is predicated was delivered between November 4, 1933, and December 30, 1933, while the boats were being operated by the bankrupt, General Marine Transit Company, Inc., a wholly owned subsidiary of the bankrupt Marine Transit Corporation.

This claim in the sum of $1,433.66, filed herein September 21, 1934, by Socony-Vacuum Oil Company, Inc., successor to Standard Oil Company of New York, Inc., against General Marine Transit Company, Inc., states "that the consideration for said debt is as follows: merchandise sold and delivered, as per itemized statement attached, for which a note was given dated February 28, 1934 in the amount of $1,433.-66, as per copy hereto attached; that no part of said debt has been paid; that there are no set-offs or counterclaims to the same; that no judgment has ever been recovered thereon; and that the only security for said debt held by said corporation are maritime liens against the following named vessels of the General Marine Transit Company, Inc.: On the vessel Craig for $132.10; on the Sterling for $341.33; on the Chilton for $256.00; on the Empire for $185.59; on the Sidway for $223.00; on the Fagan for $256.-64; on the T. W. for $39.00, for supplies and necessities consisting of fuel oil furnished them on the credit of said vessels for the said amounts respectively as per statement attached and it is not intended hereby to waive said liens or any rights which it has or may have thereunder."

There is a statement annexed to this claim giving full particulars as to the vessels, quantities, price, and total cost of the oil deliveries.

There is also annexed to the claim a copy of a note of the General Marine Transit Company, Inc., dated February 28, 1934, for said sum. Later, March 9, 1936, this claimant refiled its claim in which it more specifically alleged facts on which it based its claim of a maritime lien against certain vessels and added a statement similar to that above quoted in respect to the $3,989.29 claim.

There is no question of laches involved here; but the trustee contends that the three months' promissory note, dated February 28, 1934, in the sum of $1,433.66, which was given by the General Marine Transit Company, Inc., at the request of the claimant, acted as a waiver of the maritime lien. In the case of The Denelfre (D.C.) 59 F.(2d) 213, at page 215, the court, citing a number of cases, said: "It is equally well settled that, while such a lien may be waived by words or conduct indicating such an intention, the mere acceptance, by a person who has furnished necessaries to a vessel, of the promissory note of the owner of such vessel, does not, in itself, constitute, or result in, such a waiver, unless shown to have been accepted with that intention." There is no evidence here of any intention to waive the lien.

While it is true that the General Marine Transit Company, Inc., was not strictly the owner of the vessels, nevertheless it operated the fleet for the Marine Transit Corporation and was a wholly owned subsidiary of the Marine Transit Corporation. The two corporations were so closely affiliated as to be, for all practical purposes, the same— witness the consolidation of their bankruptcy proceedings.

The trustee in support of its contention, cites Phelps v. The Camilla, supra, which was cited with approval in Marshall & Co. v. The President Arthur, 279 U.S. 564, 49 S. Ct. 420, 73 L.Ed. 846. In the Phelps Case, copper was furnished the agents of the vessel for the purpose of repairing it. The sale was made on the written order of the agents and made no mention of the vessel or her owners. The copper was charged to the agents and they gave their negotiable note which was not paid. Some months later the libelants changed the account on their books and charged the copper to the ship and her owners. Taney, J., then a Circuit Justice, held that the copper was sold to the agents upon their personal credit and that the libelant had no lien. That is not the case here. It has been held in this District that the acceptance of the note of a third person does not discharge the maritime lien. The James T. Easton (D.C.) 49 F. 656. And in the case of The President Arthur (C.C. A.) 25 F.(2d) 648, 649, Judge Manton wrote: "There is a marked distinction between the effect of taking a note for an obligation which already existed, and agreeing in a contract which referred to an obligation hereafter to arise, that the payment of that obligation must be made by promissory note."

I am of the opinion that the referee properly allowed this claim of $1,433.66 as a maritime lien claim to the extent of $1,394.66 and as a general claim for the balance of $39.

III. The claim of Vacuum Oil Company, Inc., for $635.36. This claim was for deliveries of oil, etc., made between November 27, 1933, and February 28, 1934, by the Vacuum Oil Company, Inc., to various vessels of the bankrupts. This claim for $635.-36 filed herein by Vacuum Oil Company, Inc., against General Marine Transit Company, Inc., states that "the consideration of said debt is lubricating oil supplied as set forth in the annexed statement marked 'Exhibit A.'" The said annexed statement lists six motor ships of the General Marine Transit Company, Inc., and the dates of delivery of the oil and the charges therefor. This would inform any one reading the claim and the annexed statement or bill, that the origin of the debt was such that the creditor would have a maritime lien therefor. Shortly after filing the claim the Vacuum Oil Company, Inc., merged with the Socony-Vacuum Oil Company, Inc., under the name of the latter. The Socony-Vacuum Oil Company, Inc., received a notice of the referee's order for the filing of lien claims before March 10, 1936, and although it refiled the two claims heretofore discussed, it failed to refile this one. However, on October 1, 1936, the referee granted a motion to refile this claim as a lien claim.

With respect to this claim, as I stated above, it alleged sufficient facts, when filed, May 26, 1934, to indicate that it would give rise to a maritime lien. The claimant's excuse for failing to refile it as a lien claim before March 10, 1936, the date specified in the order of the referee dated February 6, 1936, was the fact that the record of the claim was kept separately as a part of the business of the former Vacuum Oil Company, Inc., so that the legal department of the merged corporation, i. e., the Socony-Vacuum Oil Company, Inc. was not aware of it. The merger took place after the claim was filed. It may be that the merger led to some misplacing of the records and accounts for the oversight and failure to refile in time. Under all the circumstances, I think the referee properly exercised his discretion [Lewith v. Irving Trust Co. (C.C.A.) 67 F.(2d) 855] in permitting the amendment at the hearing, October 1, 1936, and that he was

420

right in allowing this as a maritime lien claim.

The referee's order of May 10, 1937, is therefore modified as herein indicated. Submit order in accordance with this opinion on two days' notice.