### THE EASTERN SHORE.

### THE LEXINGTON.

### THE PIANKATANK.

### RECONSTRUCTION FINANCE CORPORATION v. NEW CASTLE TERMINAL CO.

No. 2353.

District Court, D. Maryland.
March 12, 1940.

965

Theodore R. Dankmeyer, of Baltimore, Md. (Niles, Barton, Morrow & Yost, of Baltimore, Md., of counsel), for R. F. C.

John H. Skeen, of Baltimore, Md. (Beeuwkes, Skeen & Oppenheimer, of Baltimore, Md., of counsel), for Chesapeake Marine Ry., Redman-Vane Co., and Brown.

Edward L. Parlett, of Baltimore, Md., for the Fitzgeralds.

G. VanVelsor Wolf, of Baltimore, Md. (Marbury, Gosnell & Williams, of Baltimore, Md., of counsel), for Curtis Bay Towing Co. and Donaldson Co.

CHESNUT, District Judge.

The controversy in this case is between the holder of a statutory preferred ship mortgage (see Title 46, U.S.Code, § 911 et seq., 46 U.S.C.A. § 911 et seq.) and preferred maritime liens as defined in section 953 of Title 46, U.S.Code, 46 U.S.C.A. § 953.

Under date of May 25, 1938 the New Castle Terminal Company made a preferred ship mortgage to the Reconstruction Finance Corporation as security for a loan of eighty thousand dollars ($80,000), covering the vessels named the "Eastern Shore", "Lexington" and "Piankatank". The mortgage was duly executed, delivered, recorded and noted on the ship's documents in accordance with all the requirements and formalities of the Federal Ship Mortgage Act, on June 3, 1938. The mortgagor very soon made default in the terms of the mortgage and on August 22, 1939 the Reconstruction Finance Corporation filed its libel in this court, in consequence of which

in due course the three vessels were sold for the following amounts: The Eastern Shore for $30,500; the Lexington for $2600, and the Piankatank for $3600, or a gross sum of $36,700. Accumulated court costs, fees and expenses have aggregated about $600, leaving in the registry of the court about $36,100 for distribution among the parties entitled thereto. Numerous intervening libels have been filed claiming various sums aggregating over $25,000. Some of the claims are for services or supplies to the ships ante-dating the mortgage and some subsequent thereto. It is agreed by counsel that valid intervening liens ante-dating the mortgage are entitled to priority unless waived and also that subsequent liens, except for torts and seamens' wages, so far as this case is concerned, are subordinated to the mortgage. See Detroit Trust Co. v. The Thomas Barlum S. S. Co., 293 U.S. 21, '55 S.Ct. 31, 79 L.Ed. 176; Morse Dry Dock Co. v. Northern Star, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082; The Henry W. Breyer, D.C.Md.1927, 17 F.2d 423, 427; The Emma Giles, D.C., 15 F.Supp. 502, 504, 507.

With this preliminary statement of the case I come at once to the consideration of the facts and law governing the disposition of the several claims involved in the intervening libels, to the extent that they have been pressed in this case, after due notice to all claimants.

■ 1. Claim of Redman-Vane Co. I allow this claim in the amount proved, $378.49. It is for painting and other repair work on the Lexington begun on June 2, 1938 and completed June 4, 1938. When the work was begun the mortgage had not yet been recorded and I find from the testimony that the claimant had no actual or constructive notice thereof. The claimant is entitled to be paid for the whole work done even though during the course of the work the mortgage was recorded on June 3rd. See The New York, D.C., 288 F. 83.

2. Claim of the Chesapeake Marine Railway. This claim contains four items. (a) $630 for repairs to the Eastern Shore on December 15, 1937; (b) $1116 for work on the Lexington at various dates in May and November, 1937, and May 1938; (c) $625 for the cost of construction of a specially made rudder for the Eastern Shore at the agreed price of $625. This rudder was ordered November 1937, built thereafter and ready for delivery to the Eastern Shore before the making of the mortgage but delivery was delayed at the request and for the convenience of the ship owner and the rudder was not actually installed on the ship until August 16, 1938, after the making of the mortgage; (d) claim for $11 for work on the Piankatank on March 31, 1938.

■ I disallow all these claims. As to the item of $625 for the rudder, it seems quite clear there was no valid maritime lien for the work of constructing the rudder and or until it was actually installed on the vessel. It was not furnished to the vessel until then. See 46 U.S.C.A. § 971; Piedmont Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97; Carr v. Warren Corp., 4 Cir., 2 F.2d 333; The Geisha, D.C., 200 F. 865, 868.

■ As to the other claims, I find as a fact from the testimony that while there were valid maritime liens therefor prior to the mortgage they were at least impliedly waived and subordinated to the mortgage by the conduct of the claimant at the time of the making of the mortgage. Without reciting all the evidentiary facts bearing on this it is sufficient to say that Mr. Craig, president of the claimant, acquired actual knowledge, or at least had definite notice, that the mortgage was in course of execution, conferred with the parties in interest at the time of its consummation, did not bring to the attention of the representatives of the Reconstruction Finance Corporation the existence of his claim, and by his conduct, either expressly or impliedly, agreed to postpone the claim to the mortgage. The necessity for the loan was in large part to defray the costs of new Diesel engines for the Eastern Shore. Mr. Craig became the contractor for the installation of these engines at a cost of about $40,000. He knew the money would become available only from the loan. He called the attention of Mr. Garlick, president of the New Castle Company, to his outstanding bills for work on the several boats, and it was originally agreed between them that these bills should be paid from the proceeds of the loan, together with other bills against the vessels which were assembled and listed at the time of closing the mortgage transaction when on June 3, 1938 the representatives of the several parties and the attorneys of some or all of them met in the building of the Union Trust Company of Baltimore. It was found, before the closing that the money available would not be sufficient to

pay all the outstanding bills which were listed and Mr. Garlick testified that he then asked Mr. Craig to postpone the payment of his prior claims for three months, and that Mr. Craig agreed. The particular claims were then omitted from the list of prior claims brought to the attention of the representatives of the Reconstruction Finance Corporation and sworn to by Mr. Garlick as all the liens against the ships. The fact is corroborated very largely by letter dated January 27, 1939 from Mr. Craig to the Reconstruction Finance Corporation. Mr. Craig's verbal testimony is somewhat inconsistent with that of Mr. Garlick but considering all the testimony in the case bearing upon the point, I conclude and find as a fact that what transpired constituted in effect either an express or implied waiver by Mr. Craig of the liens referred to. It will be noted also that there was very considerable delay in the enforcement of the liens of the claimant. See The President Arthur, 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846; 46 U.S.Code, § 974, 46 U.S.C.A. § 974; The Marsodak, 4 Cir., 94 F.2d 339; The John Cadwalader, 3 Cir., 99 F.2d 678; The Hughes Line, D.C., 29 F.2d 629.

3. The claim of Brown, the purser of the Lexington. This claimant had been employed as purser of the Lexington for a year or more prior to March 1939. He was taken sick on one of the boat trips on the Chesapeake Bay and hospitalized for some weeks at the Marine Hospital in Baltimore without expense to himself or his employer. He was not employed for any definite period of time but he was carried on the pay roll during his illness at the hospital and for some little time thereafter at his own home during his convalescence. He returned to service on the ship about June 1, 1939. The vessel owner not only carried him on the pay roll but expressly promised to pay his salary during his sickness. He was paid for two weeks but not for the balance of the time, at the rate of about $20. a week. His claim is for about $160, the proctors for the parties to agree upon the exact amount. Under section 953 his claim for wages is preferred over the mortgage. I allow this claim.

4. General seamens wage claims. When the boats were libeled on August 22, 1939 the crews of the Eastern Shore and Lexington discontinued service. The Piankatank had been out of service and docked for some time prior thereto and had no crew on board. Sums aggregating about $1024 were due to the crews of the Eastern Shore and Lexington up to the date of the libel. The New Castle Company was without funds to pay these wages and without assets or credit to obtain the necessary funds. As these wages constituted a preferred claim in priority to the mortgage, the Reconstruction Finance Corporation advanced the necessary money to make the payments and took assignment of the wage claims. The amounts were paid to the seamen within about sixty days from the libel.

The intervening libels on behalf of the members of the crews of these two vessels asserted claims for wages for the balance of the month, and for maintenance for that period, and for double time for the delay in payment under Title 46, U.S. Code, § 596, 46 U.S.C.A. § 596. I am obliged to disallow all these extra claims over and above the $1024 paid by the Reconstruction Finance Corporation. The testimony shows affirmatively that the members of the crews were not employed by the month or for any period stated, but were paid from time to time only for the services actually performed from day to day. The precarious financial condition of the Company was well understood by all its employes who, the testimony shows, generally were desirous of continuing their employment from time to time so long as possible, by enabling the New Castle Company to continue in business. While the Company has continued its corporate existence since the libel, it has been operating substantially without capital and financing each chartered voyage for carriage of freight from its particular receipts. I find the situation to be substantially identical with that described in Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696, where claims for double wages under the statute were disallowed.

5. Claim of the Fitzgeralds. Mr. Fitzgerald was employed as chief engineer of the Piankatank in April and May 1937 at $150 a month. His two sons were employed as his assistants or otherwise in the service of the ship. He and his two sons also rendered repair and maintenance services to the Piankatank in December 1937 when she was laid up for the winter. The total amount now due them and still unpaid for wages or salary amounts to $595. It is true that there has been con-

siderable delay or laches in their enforcement of their liens but under all the circumstances disclosed in the testimony I find as a fact that their delay was excusable as they frequently were in contact, by correspondence or otherwise, with the president of the New Castle, Company, who from time to time promised payment but apparently was unable to do so by virtue of the restricted funds. There is nothing to show that any of these claimants had any knowledge or notice of the making of the mortgage. It is true that their claims were not included in the itemized list given and sworn to by Mr. Garlick, but I think he was nevertheless acting in good faith because he seems to have been under the wrongful impression that the Fitzgeralds were content to look to him personally for the ultimate payment. I find nothing, however, to indicate any waiver by them of their claims against the ship by conduct, knowledge or other elements of estoppel. I conclude their claims should properly be allowed ahead of the mortgage. See The Lakeport, D.C., 15 F.2d 575; The Eastern Temple, 4 Cir., 94 F.2d 374.

 6. Claim of the Curtis Bay Towing Company, and the Donaldson Company. This is a tort collision claim in the amount of $288. The accident occurred on February 28, 1939 when the Lexington negligently collided with the Tugboat Chester, owned by the Curtis Bay Towing Company and chartered to the Donaldson Company, while the Chester was moored at the dock and the Lexington was backing out from her dock in Baltimore. The testimony shows conclusively that the Lexington was solely at fault. The necessary repairs were made by the General Shipbuilding Company in Baltimore and paid for by the Donaldson Company. This tort claim is also preferred over the mortgage by section 953. See The Acropolis, 1924 A.M.C. 1510; The Stevens, 170 U.S. 113, 122, 123, 18 S.Ct. 544, 42 L.Ed 969. This claim will be allowed.

After deducting the amounts of the several preferred claims hereinabove allowed, the balance of the fund in the registry of the court is awarded to the Reconstruction Finance Corporation on account of its preferred mortgage, as to which there is no claim of invalidity either as to legality or amount. It appears that the Reconstruction Finance Corporation had some other security for its loan but it is not disputed that after credit of the proceeds thereof and estimate of value of any remaining collateral, there will still be a substantial deficiency in the payment of the loan over and above the amount realized in this case.

 It has been informally suggested by counsel for the Reconstruction Finance Corporation that no court costs or taxable fees should be payable out of the fund with the effect of diminution of the balance payable to the Reconstruction Finance Corporation. It appears that upon the institution of the suit the clerk required counsel for the Reconstruction Finance Corporation to deposit $15. on account of court costs. Apparently this item should be returned in view of the provisions of 28 U.S.Code, § 870 as recently amended, 28 U.S.C.A. § 870. Of greater significance, however, is the view advanced that under no circumstances can court costs be awarded against the Reconstruction Finance Corporation, because it is a corporation of the United States created by Act of Congress exclusively for governmental purposes. No specific statute is pointed to in support of this contention but the argument is based on the general rule that "in the absence of a statute directly authorizing it, courts will not give judgment against the United States for costs or expenses." United States v. Chemical Foundation, 272 U.S. 1, 20, 47 S.Ct. 1, 8, 71 L.Ed. 131; United States v. Worley, 281 U.S. 339, 344, 50 S.Ct. 291, 74 L.Ed. 887. Cf. United States v. The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313; The Pasadena, 4 Cir., 55 F.2d '51. The general question thus raised is said to be now pending in the Second Circuit in the case of Menihan Corp. v. Reconstruction Finance Corporation, where, in a suit unsuccessfully brought by the Reconstruction Finance Corporation to protect certain property rights in trademarks acquired by it, the district court refused to award costs against it. See Federal Dep. Ins. Corp. v. Casady, 10 Cir., 106 F.2d 784, 792. Assuming the correctness of this general proposition, I am not satisfied that it is applicable in the present situation. The items of fees and costs principally involved here are fees of the clerk and marshal which have been taxed in accordance with the authority of statutes and rules of court. The matter is seemingly only of bookkeeping significance, so far as the Government is concerned, because the clerk and marshal are respectively accountable to the Government for all fees. From one point of view it will be a dis-

advantage, theoretically at least, to disallow payment of these fees from the fund in the registry of the court realized from the sale of the vessels, because if that is done, the Government through the clerk and marshal will fail to earn these fees and the amount thereof will be a part of the fund credited on the claim of the Reconstruction Finance Corporation, thus diminishing the deficiency which it otherwise would have against the mortgagor. Again, it may be observed that the allowance of the usual fees in this case incidentally arising from the sale of the vessels is not precisely the same as awarding costs against the United States or its wholly owned governmental corporation, in favor of the adverse party. But however that may be, I think the point has been too informally presented and the right asserted in the above cases is not sufficiently clear to warrant a departure at this time by a special order from the ordinary procedure with respect to the retention by the clerk of the fees in question. If the matter should be considered of sufficient importance, to justify it, counsel for the Reconstruction Finance Corporation may raise the point in some formal way, as by petition for the retaxation of costs, which can be heard in due course after appropriate notice to other parties in interest.

Counsel for the parties may submit appropriate order or decree in due course. The findings of fact and conclusions of law herein stated are believed to be sufficient in accordance with the admiralty rule.