## RODRIQUEZ et al. v. THE G. K. DAUNTLESS et al.

### No. 111.

District Court, S. D. Florida, Tampa Division.

March 4, 1947.

Charles Ross and Oliver C. Maxwell, both of Tampa, Fla., for libelants.

T. Paine Kelly, Jr., of Tampa, Fla., for libelees.

DE VANE, District Judge.

The precise question presented by this libel does not appear to have been previously adjudicated. The question presented is whether the agent of a charterer may have a lien for supplies furnished and other necessary expenditures made where the duty rests upon the charterer to immediately furnish the supplies and make the expenditures. The facts in the case are not seriously in conflict.

In August, 1945, Grace Shipping Company of Kingston, Jamaica, owner of the British motor vessel, G. K. Dauntless entered into a charter party with Astudillo Y Cia, of Havana, Cuba, for the hire of said motor vessel for a period of three months. The charter party gave the charterer complete control over the operation of the vessel during that period, subjecting the Master and crew to the charterer's orders and instructions. The charter party also provided that the charterer would pay all expenses arising out of the vessel's operations and that certain of such expenses would be charged to the owner and deducted from the charter hire upon periodic settlements between the parties. The charter party did not prohibit the creation of maritime liens against the vessel. One copy of the charter party was delivered to each party thereto and one remained on the vessel in custody of the Master.

In October, 1945 the charterer instructed the Master to make a voyage from Havana, Cuba, to Tampa, Florida, and upon arrival in Tampa to report to and receive instructions from libelants who would act as Ship's Agent in that port. The Master carried a letter from charterer to libelants but same was not introduced in evidence and its contents are not known. The charterer also

sent as super-cargo with the vessel a Mr. Palmer. Upon arrival in the port of Tampa the Master and Palmer reported to libelants and the Master delivered to libelants the letter entrusted to him by the charterer for delivery. Libelants performed all services and furnished all supplies necessary for the motor vessel's entry into the port of Tampa and clearance therefrom for its return trip to Havana and paid for all the supplies furnished the vessel taking receipted bills therefor, which were sent on to the charterer with libelants' bill for services and expenditures made in behalf of the vessel. The total expenditures amounted to $1,841.05, an itemized list of which was attached to the libel.

There is no question that the services and supplies furnished the vessel were of such nature as a maritime lien did attach, if such a lien exists in law in favor of the libelants.

Libelees interposed three separate and complete defenses to the libel. They may be summarized as follows:

First, as agent for the charterer libelants bear such a relationship to the vessel that they are incapacitated from obtaining a lien thereon, except under a specific agreement with the owner.

Second, if libelants had the capacity to acquire a lien upon the vessel they waived their right thereto by paying the costs and expenses of the voyage on the open credit of their principal, the charterer, in conformity with the terms of the charter party.

Third, by placing receipted vouchers for all costs and expenses of the voyage in the hands of the charterer and thus enabling him to collect from the owner all of the items due under the terms of the charter party and by failing to notify the owner that payment had not been made to them by the charterer libelants are estopped to assert any right which may have accrued to them to proceed against the vessel.

The evidence shows that libelants carry on a general business as importers, exporters and ships' agent in Tampa, Florida. They were not general agent for Astudillo Y Cia. However, they had previously, on one occasion, acted as agent in connection with a vessel known as the Victoria. On that occasion they collected the freight for the vessel's cargo and the disbursement account expended by them in connection with the voyage of the vessel was deducted from the freight and the balance remitted to Astudillo Y Cia. On the occasion when libelants acted as agent for the charterer in connection with the Dauntless the testimony indicates that the arrangement for them to act in that capacity was negotiated by a representative of Cana & Co., the owners of the cargo being exported from Tampa to Cuba.

As stated above, libelants handled the Dauntless in accordance with their duties as Ship's Agent, supervising the discharging of the inbound cargo and the loading of the cargo for Cuba and their services appear to have been satisfactory in every particular.

Shortly after departure of the Dauntless libelants prepared their disbursement account, attaching thereto the receipted vouchers pertaining to the expenses they had incurred, and forwarded same to Astudillo Y Cia for payment. Astudillo Y Cia acknowledged receipt of the account, by letter, and advised that they would pay the same shortly. This they failed to do. In December, 1945 libelant Ramon Quesada went to Cuba and made demand upon Astudillo Y Cia for the amount due on this account. All he got were promises. In May, 1946 libelant Rodriquez made a call on Astudillo Y Cia, in Havana, demanding payment. At that time Astudillo Y Cia gave libelants three drafts covering the amount due, payable October 1, November 1, and December 1, 1946. The first of these drafts was protested and none of the drafts have been paid.

In December, 1945 in accordance with the provisions of the charter party, Astudillo Y Cia submitted an account to Diaz & Co., agent for the owner of the Dauntless in Havana, Cuba, showing a charge against the owner of $420.19, for its share of the expenses incurred on the voyage to Tampa, Florida. Attached to the account were the receipted bills secured by libelants from persons furnishing services and supplies to the Dauntless while in the port of Tampa. This account was paid by the owner of the vessel.

This is a brief summary of the facts upon which this libel is based and the defenses are grounded. In this connection, however, it should be added that this libel was filed August 15, 1946, which was the first visit the motor vessel Dauntless had paid to the port of Tampa since its visit in October, 1945, which visit is the subject of this libel.

There is testimony to the effect that libelants had been on the lookout for the return of the vessel to the port of Tampa for the purpose of filing this libel against it upon its first return to the port of Tampa and in this connection it should also be noted that the libel was filed before any of the drafts accepted by libelants from the Astudillo Y Cia fell due.

### Libelants' Right to a Maritime Lien.

Prior to the decision of the Supreme Court of the United States in Dampskibaselskabet Dannebrog et al. v. Signal Oil & Gas Co. of California, 310 U.S. 268, 60 S. Ct. 937, 84 L.Ed. 1197, it was the law of this Circuit that where a charter party required the charterer to provide and pay for certain supplies and services the charterer or his agent could not acquire a lien against the ship or a claim against its owner, under the Act of June 23, 1910, 36 Stat. 604, 46 U.S. C.A. § 971 et seq. The Cratheus, 5 Cir., 263 F. 693; Pensacola Shipping Co. v. United States Shipping Board, 5 Cir., 277 F. 889. Following the decision of the Supreme Court of the United States in W. A. Marshal & Co., Inc., v. S. S. President Arthur, 279 U.S., 564, 49 S.Ct. 420, 73 L. Ed. 846, the Circuit Court of Appeals in Galatis et al. v. Galatis, 5 Cir., 55 F.2d 571, 573, by way of obiter dictum said, "It may be that even a general agent, unless his agreements with the owner amount to a waiver of the lien under 46 U.S.C.A. § 974, as explained in W. A. Marshall & Co., [Inc.] v. The President Arthur, [supra,] may now have a lien under the broad language of 46 U.S.C.A. § 971." This appears to have been an accurate forecast of the legal effect of the decision of the Supreme Court of the United States in Dampskibsselskabet Dannebrog et al. v. Signal Oil & Gas Co. of California, supra.

While the question in the latter case was whether a material man, who furnished fuel oil to a vessel on the charter-er's order, is entitled to a maritime lien, the opinion of Chief Justice Hughes in this case makes it clear that the Act of June 23, 1910, as amended by the Act of June 5, 1920, 41 Stat. 1005, 46 U.S.C.A. § 971 et seq., grants a maritime lien to any one furnishing services or supplies, unless the charter party prohibits a lien or unless the party furnishing the supplies and services, by agreement or conduct, waives the lien or is estopped to assert it. This case holds that where a material man furnishes supplies on the order of the person authorized to obtain them, he is entitled to rely on the credit of the vessel as well as upon the credit of the one who gives the order. And under the statute it is not necessary to allege or prove that credit was given to the vessel. The case also holds that it is immaterial whether the person furnishing the supplies looks first to the charterer or his agent for his pay.

While Dampskibsselskabet Dannebrog et al. v. Signal Oil & Gas Co. of California, supra, did not deal with the precise question presented by this case, the legal principle there announced is certainly controlling here. If material men and those furnishing services to a vessel on the order of the charterer or his agent are entitled to a maritime lien it must follow that the charterer or his agent, who has the authority to and does order the supplies and the services for the vessel, is entitled to subrogation and to a lien where he pays the material men and those furnishing services, for the supplies and services furnished. To otherwise hold would place an unreasonable interpretation upon the statute giving such liens.

Counsel for libelees vigorously argues that to hold that charterers or agents of charterers have liens for supplies and services furnished a vessel would open the door to fraud. Congress obviously had this clearly in mind when it provided in the Act of June 23, 1910 that the owner of a vessel may provide in his charter party that the creation of maritime liens is prohibited. In construing this provision of the statute, Chief Justice Hughes held in Dampskibsselskabet Dannebrog et al. v. Signal Oil & Gas Co. of California, supra, [310 U.S. 286,

962

60 S.Ct. 943], that any one dealing with a charterer, his agent or representative, was charged with notice of the contents of the charter party and that where the owner fails to prohibit the creation of maritime liens "he should not be heard to complain when it appears that it is the charterer's business to obtain supplies to keep the vessel on her way and the charter has not prohibited reliance upon the credit of the vessel."

As pointed out above the charter party in this case did not prohibit the creation of maritime liens. The agent for the charterer was not a general agent and the Court holds that under the circumstances as disclosed by the evidence in this case, libelants, in doing what they did "to keep the vessel on her way", were entitled to rely on the credit of the vessel and have a maritime lien for the supplies furnished and services performed, unless they waived their lien or by their conduct are estopped to assert it.

### Defense of Waiver

Libelees assert that if libelants had the capacity to acquire a lien upon the vessel they waived their right thereto by paying the costs and expenses of the voyage on the open credit of their principal, the charterer, in conformity with the terms of the charter. Little need be said as to this defense. In Dampskibsselskabet Dannebrog et al. v. Signal Oil & Gas Co. of California, supra, in passing upon this question, the Supreme Court said: "The material-man is entitled to furnish the supplies upon the credit of the vessel as well as upon that of the charterer and the lien is not defeated by the fact that the charterer has promised the owner to pay." The Court holds that libelants did not waive their lien by first attempting to collect their expenditures on behalf of the vessel from the charterer.

### Defense of Estoppel

The law defeating the defense of waiver is equally applicable to the defense of estoppel and little need be said as to this defense. One who pleads waiver or estoppel has the burden of proof establishing the waiver or estoppel. The A. S. Sherman, D.C., 51 F.2d 782; The Hatteras,

2 Cir., 255 F. 518 and the Dana, D. C., 271 F. 356. The evidence is undisputed that libelants libeled the Dauntless as soon as they had knowledge of its first return to a United States port. They did this before the drafts they had accepted matured. Libelants are not subject to criticism for attempting to collect the amount due them from the charterer and the efforts they made to do so does not constitute an estoppel to assert their lien against the vessel.

The evidence shows that the charterer was a stranger to libelants and there is no evidence in the record that they had any knowledge of the financial condition of the charterer. The maritime lien law of 1910 gives to the owner of a vessel a simple means by which a vessel may be exempted from maritime liens when under charter. All that is necessary for him to do is to provide therein that the creation of maritime liens is prohibited. When the owner does not do so he should not be heard to complain where his charterer fails to pay bills which would constitute a lien against the vessel had they been incurred under the owner's authority.

A final decree will be entered in conformity with this memorandum decision.